

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1466-11

**JONATHAN JACOBSON, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SEVENTH COURT OF APPEALS
### LUBBOCK COUNTY

COCHRAN, J., delivered the opinion of the Court in which PRICE, JOHNSON, HERVEY and ALCALA, JJ., joined. WOMACK, J., filed a dissenting opinion in which KELLER, P.J., and KEASLER, J., joined. MEYERS, J., did not participate.

O P I N I O N

A jury convicted appellant of aggravated sexual assault of a child. During the punishment phase, appellant testified and admitted that he had had an ongoing sexual relationship with the young girl. The court of appeals held that, under the judicially created

*De Garmo*[1] doctrine, as modified by *Leday*,[2] appellant was estopped from complaining about the State's jury argument during the guilt phase because he had later admitted his guilt. Therefore, the court was precluded from addressing the merits of appellant's claim.[3] We granted appellant's petition for discretionary review to decide whether *Leday*'s exceptions to the *De Garmo* estoppel doctrine should "be extended to a broader class of guilty-phase errors."[4] We conclude that *Leday*'s reasoning applies to all guilt-stage claims of error, not merely "fundamental" claims, and we overrule any last vestiges of the *De Garmo* doctrine.[5] Therefore, a defendant who testifies at the punishment stage of trial and admits his guilt does not forfeit his right to complain on appeal about errors occurring during the guilt stage. We remand this case to the court of appeals to address the merits of appellant's complaint.

I.

Appellant's mother was a friend of B.P.'s family. Appellant and B.P. had known each

---

[1] *De Garmo v. State*, 691 S.W.2d 657 (Tex. Crim. App. 1985).

[2] *Leday v. State*, 983 S.W.2d 713 (Tex. Crim. App. 1998).

[3] *Jacobson v. State*, 343 S.W.3d 895, 899 (Tex. App.–Amarillo 2011).

[4] Appellant's sole ground for review asks, "Since defendants suffer the 'cruel trilemma' created by *De Garmo v. State*, 691 S.W.2d 657 (Tex. Crim. App. 1985), regardless of the type of error raised, should the precautions of *Leday v. State*, 983 S.W.2d 713 (Tex. Crim. App. 1998), be extended to a broader class of guilty-phase errors?"

[5] Although we have not said so expressly, it is arguable that we overruled *De Garmo* entirely in *Leday*. That, at least, was the conclusion of the *Leday* dissent. 983 S.W.2d at 730 (McCormick, P.J., dissenting, joined by Keller, J.) ("The Court's thoughtful opinion, echoing some but not all of Judge Meyers' dissenting opinion in *McGlothlin v. State*, apparently decides to abandon entirely the *De Garmo* doctrine . . . .").

other all of their lives. When he was twenty and B.P. was twelve, appellant moved in with her family. At first, appellant treated B.P. like a little sister, but then he started touching her inappropriately and, eventually, started having sex with her. This relationship lasted for about eight months–until B.P.'s mother began to notice a decline in B.P.'s grades and a general change in her attitude. Something was wrong. B.P.'s family kicked appellant out of their house because they were suspicious of his influence over B.P.

Someone reported B.P.'s mother to CPS for not taking appropriate care of her daughter. CPS determined that this charge was unfounded, but the investigators found "love letters" between appellant and B.P. and called the police. B.P. then admitted that she and appellant had had sex on many occasions.

B.P. testified that appellant told her that he "wanted to expand [her] horizons" as he got more sexual and more possessive. B.P. said that appellant was a "Goth"–"[w]earing all black, listening to heavy metal, you know, tattoos, black hair, all that stuff." At first he would put his fingers in her vagina and she would "blow" him, but then appellant "wanted to take it a step farther." Soon, they ended up having sex "just about every day." Appellant told B.P. that he loved her and wanted to marry her.

Detective Richard Mayer of the Lubbock Sheriff's Office, testified that B.P. was initially reluctant to discuss her sexual relationship with appellant, but she eventually admitted to the relationship. On cross-examination, Det. Mayer said that, at the beginning of his investigation, he did not know if appellant was innocent or guilty. Once B.P. admitted

that appellant had had sex with her, he explained that

> I still knew that even with her saying yes that I would need more to prove the case, which would be the CARE exam. So I wasn't like, 'Oh, I got this one in my win pile,' you know. . . . I still have to go through the steps of investigation to be sure that I'm not just falsely accusing somebody of something.

During closing arguments, defense counsel seized on Det. Mayer's "win pile" phrase and repeatedly suggested that his investigation had "turned into a global warming Salem witch hunt trial." He said that Det. Mayer had "jumped to conclusions." Then counsel came back to his "witch hunt" theme:

> And the thing about it is the witch hunt. You know when witch hunts were happening, they thought there was a witch. They tied them up. Weighted them down. Threw them in the water. If they survived, they were a witch. If they didn't survive, well, better safe than sorry.
> Ladies and gentlemen, we got rid of those witch hunts. . . . Ladies and gentlemen, our system must never be law enforcement saying, "I got to get enough to put it in the win pile."

He claimed that Det. Mayer "started out with 'How do I get this to the win pile? How do I get the witch in the water?'"

The prosecutor immediately responded to counsel's characterization of Det. Mayer's testimony by noting, "Somebody in this courtroom has an end result that they will twist and turn and fill in the holes to make it work . . . whatever they want to do to make it happen." Defense counsel objected that the prosecutor was "attacking Defendant over counsel's shoulder," but the trial judge overruled him, and the prosecutor continued:

> The Defense in this case has their end result, and they will twist the words of Detective Mayer. And if you don't believe me, how many times did he stand up here and use the words "win pile"?

The jury found appellant guilty of aggravated sexual assault.  Then, during the punishment phase, appellant testified and admitted to having a "sexual relationship" with twelve-year-old B.P., but stated that "she was the one kind of teaching [him] some of these things." The jury sentenced appellant to forty-five years in prison.

Appellant's sole claim on appeal was that the trial judge erred in overruling his objection to the prosecutor's argument.  The court of appeals noted that, before it could reach the merits of this claim, it had to decide if the *De Garmo* doctrine barred it from considering appellant's claim because he had admitted to the offense during the punishment phase.[6]

After a lengthy discussion of the development of the *De Garmo/Leday* doctrine, the court of appeals concluded that no case directly addresses that doctrine's application to a claim that the State struck at defendant over the shoulders of counsel.[7]  The court then analyzed "the treatment of this type of error in other contexts" to see if the State's argument could be said to implicate a "fundamental right" under *Leday*.[8]  After a second lengthy discussion, the court concluded that this type of closing-argument error "does not implicate fundamental rights, and, thus, is not in the category of error that would survive for our review under *Leday* after appellant confessed to having committed the offense."[9]  After three pages

---

[6] *Jacobson*, 343 S.W.3d at 898.

[7] *Id.*

[8] *Id.* at 898-99.

[9] *Id.* at 899.

of detailed legal analysis, the court of appeals finally determined that it could not address the merits of appellant's claim of improper jury argument. It affirmed the trial court judgment.[10]

## II.

Although the judicially created *De Garmo* doctrine derived its name from a particularly grisly capital-murder case,[11] the core of the doctrine had been a part of Texas criminal jurisprudence for many years before that. In *De Garmo*, this Court held that a defendant who testifies at the punishment stage of trial and admits his guilt to the crime for which he had been found guilty waives any challenge to the sufficiency of the evidence.[12] We noted, "The law as it presently exists is clear that such a defendant not only waives a challenge to the sufficiency of the evidence, but he also waives any error that might have

---

[10] *Id.*

[11] A jury convicted Roger De Garmo of capital murder in 1980. 691 S.W.2d at 659. At the punishment stage of the trial, De Garmo testified and admitted that "I was the one that was there and I was the one that did the crime. So, now you can at least sleep well knowing that you picked the right person[.]" *Id.* at 660. De Garmo also threatened to kill the members of the jury and their families unless they sentenced him to death:

> I'm not threatening, I'm promising that if and when some catastrophe happens and I was put back on the street, if you are not available, somebody of your possession would be and I would just say my statement is you should give me the death penalty because that's the only way you're ever going to stop me because you have put me in this position. . . . I'm going to die any way, so why not take with me some of the people that's going to make me die. That's the way I feel . . . so you better . . . put the 'Yes' on both of them questions from my point of view.

*Id.* The jury promptly did as De Garmo requested, and he was sentenced to death. *Id.* However, his conviction was overturned, and, in 1994, a second jury convicted him of capital murder but sentenced him to life in prison where he remains. *De Garmo v. State*, 922 S.W.2d 256, 260 (Tex. App.–Houston [14th Dist.] 1996, pet. ref'd).

[12] *De Garmo*, 691 S.W.2d at 661.

occurred during the guilt stage of the trial."[13]  Whether that was the "law as it presently

existed" at that time,[14] the so-called *De Garmo* doctrine was solidified in *McGlothlin v.*

*State*.[15] In that 1995 case, Judge Baird characterized the doctrine as holding that "the judicial

confession at punishment waives all error that occurred at the guilt stage of the trial."[16]

The *De Garmo* doctrine was originally built upon the notion that "[i]t would be an

exercise in futility to reverse" a case for insufficient evidence when the defendant testified

at punishment and admitted his guilt because his testimony "could be used against him on

a retrial."[17]  A second jury would necessarily convict the defendant based on his former

testimony, so it would be a waste of time and effort to require a retrial in which the evidence

clearly would be sufficient.  But that rationale for the rule disappeared when the United

States Supreme Court held that, if an appellate court finds the evidence insufficient to

---

[13] *Id.*  According to Presiding Judge Onion in his dissent in an earlier case, *Gordon v. State*, 651 S.W.2d 793 (Tex. Crim. App. 1983), the waiver doctrine  historically applied only to questions of sufficiency of the evidence and that doctrine "may well be questioned" in light of the Supreme Court double-jeopardy cases.  *Id*. at 797 (Onion, P.J., dissenting).

[14] As this Court later explained in *Leday*, "the *De Garmo*-doctrine portion of the *De Garmo* opinion is dictum, since the Court proceeded to consider and overrule the sufficiency of the evidence point that De Garmo raised."  983 S.W.2d at 723 n.14.

[15] 896 S.W.2d 183 (Tex. Crim. App. 1995).

[16] *Id.* at 188.

[17] *Boothe v. State*, 474 S.W.2d 219, 221 (Tex. Crim. App. 1971).  Strangely, in *Boothe*, as in *De Garmo*, this Court had already independently examined the evidence supporting the defendant's conviction and found it sufficient before declaring that claim waived and explaining its rationale for the waiver doctrine.  So in the very cases setting out the waiver doctrine and its rationale, we did not need to rely upon the waiver doctrine.

support the defendant's conviction, double-jeopardy principles bar a retrial.[18] Except for the

hoary doctrine of *stare decisis*, this was the only rationale for the unique Texas rule.[19]

Under the *De Garmo* waiver doctrine, if the defendant testified at the punishment

stage and admitted to committing the criminal offense, then it did not matter how egregiously

unfair or unconstitutional the guilt portion of the trial was. If the defendant's confession

were the product of physical or psychological torture, it would not matter that the trial judge

admitted it in violation of the Sixth Amendment. If the police battered down the defendant's

door, beat him up, and searched his home over his vehement protests, it was of no importance

that the trial judge admitted the illegally seized evidence in violation of the Fourth

Amendment. If the trial judge flagrantly violated the rules of evidence and procedure, too

bad. If the defendant admitted his guilt during the punishment phase, he automatically

---

[18] *Burks v. United States*, 437 U.S. 1 (1978); *Greene v. Massey*, 437 U.S. 19 (1978). *See Leday v. State*, 983 S.W.2d 713, 721 (Tex. Crim. App. 1998). In *Leday*, Judge Womack traced the history of the *De Garmo* doctrine and noted that the early cases

> held that an appellant who had admitted his guilt in the punishment stage could not appeal the sufficiency of evidence, but the Court allowed appeal of other errors that were committed at the guilt stage. The stated reason for refusing to reverse a conviction of such an appellant for insufficient evidence was that on the retrial the State would certainly obtain conviction by using the appellant's testimony from the first trial. If that reason ever had validity, it disappeared after the Supreme Court's holding that the Double Jeopardy Clause of the Fifth Amendment would be violated by a retrial after an appellate court held that the evidence of guilt was legally insufficient.

896 S.W.2d at 721 (citations omitted).

[19] *See McGlothlin*, 896 S.W.2d at 190 (Meyers, J., dissenting) (criticizing the majority opinion which "merely summarizes the meager case law in *De Garmo*'s family group, dismisses appellant's challenge to *De Garmo* as if it really missed the point of that case, and concludes with a brief homily on the virtues of *stare decisis*.").

waived appellate review of all errors–great and small–at the guilt stage.

The "waiver" holding in *De Garmo* was overturned by this Court in *Leday v. State*.[20]

Indeed, *Leday* jettisoned much of the *De Garmo* doctrine as having been built upon a false

premise of ensuring accuracy because trials are not merely a search for "truth." They are also

a societal exemplar of "fair play."[21]

> Our criminal justice system makes two promises to its citizens: a fundamentally fair trial and an accurate result. If either of those two promises are not met, the criminal justice system itself falls into disrepute and will eventually be disregarded.[22]

The *De Garmo* doctrine may arguably serve the interest of an accurate result at the guilt

stage, but it may also negate the equally important societal goal of a fair trial. And, at the

sentencing stage, it negates the interest in accuracy.[23] This Court recognized that problem

---

[20] 983 S.W.2d 713 (Tex. Crim. App. 1998).

[21] *See id.* at 724-25. Judge Womack explained,
Just as the *De Garmo* doctrine is consequential only when the guilty verdict is infected with reversible error, so too is it consequential only when an admittedly guilty person has been convicted. Recalling that a purpose of trial is to reach a true verdict is undoubtedly necessary to the resolution of the issue before us. But it can only begin our consideration. It cannot end it, because the ascertainment of truth is not the only objective of our law of criminal procedure. We as a people have deliberately chosen to adopt laws which interfere with the truth-seeking function of the criminal trial. "Due process and those individual rights that are fundamental to our quality of life co-exist with, and at times override, the truth-finding function."
*Id.* (citation omitted).

[22] *Ex parte Thompson*, 153 S.W.3d 416, 421 (Tex. Crim. App. 2005) (Cochran, J., concurring).

[23] *See* text accompanying notes 38-39 *infra*.

in *Leday* and therefore rejected the applicability of the *De Garmo* "waiver" doctrine to a

laundry list of various constitutional and other substantive or procedural guarantees.[24] These

guarantees were too important to be "waived" merely because the defendant had admitted

his guilt in a different stage of the proceedings.[25]

Our criminal-justice system depends upon trial judges making correct legal rulings.

Our laws provide for appellate review of those rulings to ensure that our system will deliver

accurate results in a fair proceeding.[26] Indeed, that is the rationale for permitting a defendant

---

[24] 983 S.W.2d at 725. This list included
- the right to have guilt proved beyond a reasonable doubt;
- the right against double jeopardy after an acquittal;
- the right to refuse to testify at trial and to be free from comment upon the exercise of that right;
- the right not to have a confession obtained by coercion or improper inducement used at trial;
- the right not to have illegally seized evidence used at trial;
- the right not to have privileged communications used against one at trial;
- the right not to have confessions obtained in violation of article 38.22 used at trial;
- the right to have jurors prevented from propounding questions to witnesses.

*Id.* This Court admitted that "[t]his list of examples may not be complete, and it cannot be final. The *agonia*, the constant struggle in American criminal procedure, is between truth-finding and other values." *Id.* But we have not identified which other rights are sufficiently important to make the grade for purposes of non-waiver under *Leday* and which are not. We did hold, in *Reyes v. State*, 994 S.W.2d 151 (Tex. Crim. App. 1999), that the *De Garmo* doctrine did not preclude appellate review of a trial court's ruling dismissing a disabled juror during the guilt stage of trial because that purported error would affect the punishment stage as well as the guilt stage. *Id.* at 153. Presumably, then, even non-constitutional and non-fundamental claims of error involving jury selection or other aspects of a trial that affect both the guilt and punishment stages are not waived under the post-*Leday De Garmo* doctrine.

[25] *Leday*, 983 S.W.2d at 725.

[26] The correctness of trial-court legal rulings and the fairness of trial procedures were the rationales for giving the State a right to appeal in 1987. As Presiding Judge McCormick has noted, the "Background" section of the State's Right to Appeal Bill states,
  "The Texas Constitution provides that the State has no right to appeal in a

to plead guilty with a plea bargain, yet appeal the correctness of judicial rulings on pretrial motions.  For example, a defendant might obtain an adverse ruling on a pretrial *Daubert*[27] hearing on the scientific accuracy of a novel polygraph procedure, and, based upon the inevitability of the polygraph  results coming into evidence, plead guilty but appeal the trial judge's ruling on the polygraph results.[28]  The *De Garmo* doctrine, even as it exists post-

---

criminal case, making Texas the only state that bans all prosecution appeals. This prohibition is viewed as a serious problem in the administration of criminal justice for several reasons: (1) On occasion, defendants are released because of questionable legal rulings excluding what may be legally admissible evidence; (2) Legal issues that have been wrongly decided by trial courts nevertheless stand as precedent, albeit unbinding, for police, prosecutors, and courts; and (3) Trial judges may have a tendency to resolve doubtful legal questions in favor of the defendant because such a ruling cannot harm the judge's reversal rate.

 The Texas constitutional ban, which has been in place since 1876, had its genesis in the Federal constitutional right not to be twice put in jeopardy for the same offense. In varying degrees, the federal government and all the states have enacted legislation to accommodate both a defendant's right to be free from multiple trials for the same offense and the state's right to appeal erroneous legal rulings. The focal point in the balance is that the prosecutor's right to appeal is exclusively upon legal, not factual issues.["]

*State v. Moreno*, 807 S.W.2d 327, 329 n.3 (Tex. Crim. App. 1991).

[27] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[28] *See* TEX. R. APP. P. 25.2(a)(2) ("In a plea bargain case . . . a defendant may appeal only: (A) those matters that were raised by written motion filed and ruled on before trial[.]").  At one time, this Court had judicially crafted a "waiver" of appeal doctrine by holding that when a defendant pled guilty he "waived" all non-jurisdictional errors, including constitutional claims. *See Helms v. State*, 484 S.W.2d 925, 927 (Tex. Crim. App. 1972), *abrogated by Young v. State*, 8 S.W.3d 656 (Tex. Crim. App. 2000).  This rule "discouraged guilty pleas, and caused a defendant, who wanted to preserve his appellate issues, to force the State to a full trial on the merits." *Lyon v. State*, 872 S.W.2d 732, 734 (Tex. Crim. App. 1994) (citing *Morris v. State*, 749 S.W.2d 772, 779 (Tex. Crim. App. 1986)).  In response to this judicially created waiver doctrine, the Texas Legislature amended Article 44.02 to explicitly permit both plea bargains and the appeal of trial-court legal rulings on written motions.  *See Griffin v. State*, 145 S.W.3d 645, 646-47 (Tex. Crim. App. 2004) (discussing history of the *Helms* "waiver" rule and its demise via legislative action).

*Leday*, strips away any right to judicial review of the admission of "junk science" evidence because the defendant, although he had precisely the same pretrial hearing and ruling, testified at the punishment stage and admitted guilt.[29]

The defendant who pleads guilty should not be treated more favorably in the appellate review of legal rulings than the defendant who went to trial but had the temerity to testify truthfully at the punishment phase. In the latter case, a defendant must give up his Sixth Amendment right to a trial by jury or his Fifth Amendment right to testify to ensure appellate review of the trial judge's "junk science" pretrial ruling. This trade-off of constitutional rights invokes the same "cruel trilemma" concerns that Judge Womack addressed in *Leday*.[30]

---

[29] The State claims that permitting a defendant to testify and admit his guilt while also permitting him to appeal guilt-stage rulings allows him to "have his cake and eat it, too." State's Brief at 11. First, a defendant who pleads guilty is still entitled to appeal trial-court rulings on pretrial motions, so he can have his cake and eat it, too. Second, a defendant who testifies at punishment and admits his guilt may still appeal trial court rulings on "important" guilt-stage claims under *Leday*, so he can have his cake and eat it, too.

[30] 983 S.W.2d at 723. Judge Womack explained:
The decision whether to testify [at the punishment stage] is made even less voluntary by the cruel trilemma in which the defendant is placed. If the defendant testifies truthfully and admits guilt, *De Garmo* waiver results. If the defendant testifies untruthfully and denies guilt, the consequences are exposure to punishment for aggravated perjury and, of more immediate consequence, an increased punishment on account of the perjury. And if the defendant does not testify, the opportunity is lost for the defendant to give the sentencer information that only the defendant can provide. This would exclude in every case some information that is relevant to two important objectives of the system of criminal punishment: a penalty that will prevent this offender from committing other crimes, and a recognition of the possibility of rehabilitating the individual defendant. And it will in many cases exclude information that is necessary for a defendant to carry burdens of proof. The defendant has the burden to prove eligibility for probation if the case is tried to a jury. The defendant also has the burden to prove certain mitigating issues.

This Court, in *Leday*, noted that the *De Garmo* doctrine has practical consequences only when the trial judge commits reversible error.[31]  Thus, if the defendant would not have prevailed on the merits of his appellate claim and he would not otherwise have been entitled to a new trial, then the *De Garmo* doctrine makes no difference at all.[32]  To alleviate the unfairness of this position, the Court, in *Leday*, separated procedural rights into two groups–those too important to be "waived" by the *De Garmo* doctrine[33] and those not quite so important, to which *De Garmo* waiver would continue to apply–the "great" rights and the "small" rights.

---

*Id.* at 723-24 (internal citations and footnotes omitted).

[31] *Id.* at 723.  Judge Womack explained,
It must be remembered that the *De Garmo* doctrine has consequences only if the trial court committed reversible error at the guilt stage. (If there was no reversible error, the *De Garmo* waiver is inconsequential.)  Therefore every appellant who is subjected to a meaningful consequence of the *De Garmo* doctrine is a defendant whose verdict of guilty was infected with reversible error.  Without such a tainted verdict of guilt, there would be no punishment stage, and there would be no occasion for the defendant to face the decision whether to testify.
*Id.*

[32] Of course the *De Garmo* waiver doctrine does sometimes make life easier for prosecutors and appellate judges.  Both can reject the defendant's claims with a single, dismissive sentence–"We reject all of appellant's claims concerning the fairness of his guilt-stage trial under *De Garmo*"–instead of addressing the merits of those claims. However, in cases such as this one, in which the alleged error has not previously been categorized as "*De Garmo* waiver" error or "*Leday* non-waiver" error, that categorization exercise may take more time and trouble than would any analysis of the merits of the alleged error itself.

[33] If the error "interfere[s] with the truth-seeking function of the trial," or is one of "those individual rights that are fundamental to our quality of life [that] co-exist with, and at time override, the truth-finding function," that error is not waived under the *De Garmo* doctrine. *Leday*, 983 S.W.2d at 724-25 (internal quotation marks omitted).  See the list of *Leday*'s "great" rights set out in note 24 *supra*.

According to the court of appeals in this case, the right to a trial not infected with a prosecutorial closing argument that would otherwise be reversible error[34] is not an important right. It is just a "small" right and does not fall within the *Leday* ambit of protected procedural rights.[35] Reversible error for "small" rights is waived under the *De Garmo* doctrine. This dichotomy does not make sense. Reversible error is reversible error, regardless of the character of the right being substantially gouged. As Judge Meyers explained in his *McGlothlin* dissent: When the unfairness occurs during the guilt stage of a trial, "no legitimate interest of the system is served by holding that [the defendant's admission of guilt during the punishment phase] somehow ratified the unfairness."[36]

Furthermore, the "cruel trilemma" rationale for rejecting application of the *De Garmo* doctrine in *Leday* applies with equal force in cases in which the defendant claims non-fundamental or non-constitutional error on appeal. As Judge Womack explained in *Leday*, a defendant who has been found guilty faces a "cruel trilemma" in deciding whether to testify

---

[34] We are not suggesting that the prosecutorial argument in this case was reversible error, but rather that, as a general proposition, prosecutorial arguments that *are* otherwise reversible error are waived under the *De Garmo* doctrine because the right to be free from improper closing arguments is not an important right under *Leday*.

[35] One could certainly claim that a prosecutor's argument attacking the defendant "over the shoulders of his counsel" is an error that interferes with the truth-seeking function of the trial because it diverts attention from the quality and quantity of the State's evidence and focuses attention on the personal attributes of the defendant and his counsel. One could argue either side of this "great right" vs. "small right" battle over almost any alleged error. The *De Garmo* doctrine encourages this sort of sophistic reasoning instead of focusing the appellate court's attention of the underlying merits of the alleged error in the particular case.

[36] *McGlothlin v. State*, 896 S.W.2d 183, 191 (Tex. Crim. App. 1995) (Meyers, J., dissenting).

and admit guilt at punishment.[37]  If he admits guilt, he waives error under *De Garmo*; if he denies guilt, he is exposed to aggravated perjury charges and increased punishment; if he does not testify, he loses the opportunity to give the sentencer information that only he possesses.[38]  As a practical matter, every defendant who has been found guilty faces this "cruel trilemma" decision and the *De Garmo* doctrine has an outsized impact upon the defendant's decision-making because his counsel cannot accurately predict, at the time the decision to testify must be made, whether potential appellate claims might be waived under the last vestiges of the *De Garmo* doctrine.  Thus, while the *De Garmo* doctrine may be said to serve the interest of accuracy at the guilt-stage of trial, it disserves that very same interest at the punishment stage, and it disserves the interest in the "fairness" of the trial at both stages.[39]

---

[37] 983 S.W.2d at 723-24.

[38] *Id.*  Indeed, if the *De Garmo* doctrine were to prevent the defendant from testifying at the punishment phase, it would "in many cases exclude information that is necessary for a defendant to carry burdens of proof," such as when the defendant must prove his eligibility for probation.  *Id.*

[39] *See id.*; *see also McGlothlin*, 896 S.W.2d at 191 (Meyers, J., dissenting) (noting the difficult decisions that a defendant, who believes that his guilt-stage trial was unfair, must make about whether and how to testify during the punishment stage).  As Judge Meyers explained,

> So far as I can tell, *De Garmo* and its cousins are the only vestiges of the profoundly anti-adversarial attitude which forces an accused to give up his right to appeal for the privilege of defending himself at trial. Abandoning it would not only restore fairness to the resolution of disputes in criminal litigation, but would also promote legitimate social interests, similar to those underlying article 44.02, by encouraging defendants to seek a satisfactory disposition of the case at trial in spite of judicial errors, and thereby avoid the time and expense of appellate review.

*Id.* at 192.

We do not need the *De Garmo* doctrine,[40] just as we did not need the judicially created *Helms* waiver rule.[41] We have not relied upon the *De Garmo* doctrine even once in the fourteen years since we severely limited it in *Leday*.[42] If a trial judge's legal ruling is wrong, appellate courts should address that legal ruling (if properly preserved by objection) and explain why it is wrong. But if that ruling did not "affect substantial rights,"[43] *i.e.*, it did not seriously affect the verdict or render the trial fundamentally unfair, then it is deemed harmless. The harmless-error rule, not the *De Garmo* doctrine, protects the criminal-justice system from unwarranted or undeserved reversals for improper closing arguments.[44]

For these reasons we extend the reasoning and analysis set out in *Leday* to all rights, great and small, and give the *De Garmo* doctrine the burial it so richly deserves. We reverse

---

[40] The State notes that, in any case in which the defendant has testified at the punishment phase and admitted his guilt, his judicial confession would be admissible in a retrial unless he established that he was somehow "forced" to testify and admit his guilt. *See* TEX. CODE CRIM. PROC. art. 38.21 and 38.22, § 5; *see also Brito Carrasco v. State*, 154 S.W.3d 127, 130-32 (Tex. Crim. App. 2005) (Cochran, J., concurring). But that is also true in the post-*Leday* "great-right" cases to which the *De Garmo* doctrine does not apply.

[41] *See* note 28 *supra*.

[42] Indeed, the only time that this Court has addressed the *De Garmo* doctrine since *Leday* was in *Reyes v. State*, 994 S.W.2d 151 (Tex. Crim. App. 1999), in which Judge Womack, speaking for a unanimous court, stated that "[t]he court below was led into the error of literally following our ill-written dictum in *De Garmo*." *Id.* at 153.

[43] TEX. R. APP. P. 44.2(b) ("Any other [nonconstitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

[44] *See Mosley v. State*, 983 S.W.2d 249, 258–60 (Tex. Crim. App. 1998) (harm analysis for improper jury argument uses a three-factor test); *see also Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008) ("improper-argument error . . . is non-constitutional in nature"); *Martinez v. State*, 17 S.W.3d 677, 692-93 (Tex. Crim. App. 2000) (stating that *Mosley* harm analysis applicable to improper jury argument is conducted under rule 44.2(b)).

the judgment of the court of appeals and remand this case to that court for consideration of

the merits of appellant's sole claim.

Delivered: February 6, 2013
Publish