

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-22-00051-CR

---

JASON CHAMBERS, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 19-0253-X

---

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Justice Stevens

## MEMORANDUM OPINION

Over four years after Emma's[1] initial outcry, a Harrison County jury convicted Jason Chambers, Jr., of one count of aggravated sexual assault of a child[2] and assessed him thirteen years' imprisonment. In this appeal, Chambers complains (1) that the trial court abused its discretion when it (a) denied his motion for a new trial based on the State's violation of Article 39.14 of the Texas Code of Criminal Procedure, (b) exempted one of the State's experts from Rule 614 of the Texas Rules of Civil Procedure, and (c) failed to direct the expert to answer a question by counsel, and (2) that the cumulative effect of non-constitutional error violated his right to due process and due course of law. Because we find that the trial court did not abuse its discretion and that Chambers has not shown cumulative effect of errors, we will affirm the trial court's judgment.

## I.      Denial of a New Trial Was Not an Abuse of Discretion

In his first and second issues, Chambers asserts that the trial court abused its discretion when it denied his motion for a new trial based on the State's failure to produce evidence of the pending investigation and criminal charges of sexual abuse against his nephew, Cal. He also asserts that the State's failure was a violation of Article 39.14 of the Texas Code of Criminal Procedure that impacted his substantial rights.[3]  *See* TEX. CODE CRIM. PROC. ANN. art. 39.14 (Supp.).

---

[1]We refer to the minor victim, her family members, and other minors by pseudonyms.  *See* TEX. R. APP. P. 9.8(b)(2).

[2]*See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iv), (a)(2)(B).  The jury found Chambers not guilty of another count of aggravated sexual assault of a child.

[3]Although Chambers lists these as separate issues, he briefs them as a single issue.

2

## A. Background

On July 29, 2017, Emma, who was ten years old at the time, made an outcry to her mother, Carla, and told her that she did not like it when Daddy[4] put his "peanut" on her butt because it hurt. About one week later, Emma gave a forensic interview at the Children's Advocacy Center (CAC) in Longview. Emma told the interviewer that her daddy touched her body with his body part but that she did not want to talk about it because it was gross and inappropriate. She eventually added that the inappropriate things happened at her daddy's house after her bath or shower and on daddy's bed. She also said that only her daddy did those things and that they had not happened to her with anyone else. A few days later, Emma was given a SANE[5] examination and disclosed to the nurse that the inappropriate thing that her daddy did was he put his "peanut"[6] in her butt and that it happened in her daddy's bedroom after showers and baths. Emma's testimony at trial was consistent with her previous statements.

CAC professionals also interviewed Mick, who was almost five years old at the time. Mick told the interviewer that Chambers's nephew, Cal, touched his peanut. Mick stated that Cal would touch his "peanut" and touch James's[7] "peanut," then Cal would wash his hands. Apparently, law enforcement did not investigate Mick's allegations. On cross-examination, Emma testified that Cal and James lived with Chambers's parents and that they lived next door

---

[4]Carla and Emma lived with Chambers from the spring of 2012 until February 2017, and Emma called Chambers "Daddy." At the time of her outcry, Emma and her brother, Mick, stayed one week at Carla's house, and the next week at Chambers's house.

[5]Sexual assault nurse examiner.

[6]Emma said that a "peanut" was what he used to pee.

[7]James was Cal's younger brother.

3

to Chambers. She also testified that Cal, James, Mick, and she had played together for a couple of years before her outcry.

Between August 10 and August 25, 2017, Chambers gave three interviews to law enforcement. Although he denied Emma's allegations, Chambers also disclosed that he would towel Emma off after her bath, that he would place her naked on his bed to put lotion on her, and that sometimes he was naked while he did those things. Chambers also testified at trial and denied Emma's allegations.

Chambers filed a motion for a new trial and asserted that he discovered after trial that Cal had been investigated for sexual abuse of James, that Cal was currently under investigation for sexual abuse of his half-sister, and that the State failed to disclose that information in violation of Article 39.14 of the Texas Code of Criminal Procedure. In his affidavit in support of the motion, Chambers's attorney averred that, after sentencing, Chambers produced a cell phone that contained text messages from June 25, 2017, regarding Cal watching Emma use the restroom. He also averred that Chambers told him that he recalled finding Cal in Emma's room months before her outcry. In addition, he averred that, after the trial, Chambers's family gave him a letter related to an investigation of Cal for sexual abuse of James.

At the hearing on the motion for a new trial, Chambers testified that he found out about Mick's allegations against Cal in a telephone call from his counsel.[8] He testified that Cal was eighteen years old at the time of the new trial hearing.[9] Chambers also testified that, in 2017, he

---

[8]At trial, Chambers acknowledged that, while preparing for trial, he was made aware that Mick said someone touched him.

[9]When the motion for a new trial was filed, Cal was seventeen years old.

4

caught Cal watching Emma go to the bathroom two times. After the second time, Chambers sent a text message to Carla and his sister and spoke to his mother to let them know what happened. The text messages were sent on June 25, 2017, about one month before Emma's outcry. He further testified that there were a few occasions when Cal would go into Emma's room and shut the door; those events were suspicious to Chambers. Although that behavior concerned him, he admitted that he never reported it. Chambers also averred that he had learned that Cal had criminal charges pending that accused him of sexually abusing his half-sister, who was about the same age as Emma.[10]

After hearing arguments of counsel, the trial court denied the motion.

## B.     Standard of Review and Applicable Law

A trial court's denial of a motion for a new trial is reviewed for an abuse of discretion. *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). We will reverse the trial court "only if no reasonable view of the record could support the trial court's ruling." *Id.* (citing *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012), *overruled on other grounds by Miller v. State*, 548 S.W.3d 497, 498 (Tex. Crim. App. 2018)). Under this standard, we "view the evidence in the light most favorable to the trial court's ruling," *id.* at 820 (citing *Riley*, 378 S.W.3d at 457), and we "imply findings and conclusions in favor of that ruling if none are issued," *id.* at 821 (citing *Riley*, 378 S.W.3d at 459). If it supports the trial court's ruling, we must assume that the trial court disbelieved testimony supporting the appellant's claims. *See id.*

---

[10]In his affidavit in support of his motion, Chambers averred that he learned about the investigation and criminal charges against Cal after the trial.

5

When there are two reasonable views of the evidence, the trial court's ruling is within the zone of reasonable disagreement, and we must uphold the ruling. *Id.* at 820.

To be entitled to a new trial on the basis of newly available evidence, the defendant must show:

> (1)  the newly discovered evidence was unknown or unavailable to the defendant at the time of trial;
>
> (2)  the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence;
>
> (3)  the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and
>
> (4)  the new evidence is probably true and will probably bring about a different result in a new trial.

*Carsner v. State*, 444 S.W.3d 1, 2–3 (Tex. Crim. App. 2014).  Further, "[t]rial courts should not grant a new trial if the defendant's substantial rights were not affected."  *State v. Herndon*, 215 S.W.3d 901, 908 (Tex. Crim. App. 2007).

Article 39.14(h) of the Texas Code of Criminal Procedure provides that "the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged."  TEX. CODE CRIM. PROC. ANN. art. 39.14(h) (Supp.).  "Under Article 39.14(h), the State has an affirmative duty to disclose any relevant evidence that tends to negate guilt or mitigate punishment."  *Watkins v. State*, 619 S.W.3d 265, 277 (Tex. Crim. App. 2021).  Because Article 39.14(h) does not limit the disclosure of exculpatory, impeachment, or mitigating evidence to material evidence, the State's

6

"duty to disclose is much broader than the prosecutor's duty to disclose as a matter of due process under *Brady vs. Maryland*." *Id.* (citing *Brady vs. Maryland*, 373 U.S. 83 (1963)). Nevertheless, because a violation of Article 39.14 is a statutory error, any failure to disclose the evidence is to be disregarded unless the error affected Chambers's substantial rights. *See Layman v. State*, No. 06-21-00003-CR, 2021 WL 5972092, at *3 (Tex. App.—Texarkana Dec. 17, 2021, pet. ref'd) (mem. op., not designated for publication);[11] *Watkins v. State*, No. 10-16-00377-CR, 2022 WL 118371, at *1–2 (Tex. App.—Waco Jan. 12, 2022, pet. ref'd) (mem. op., not designated for publication) (opinion on remand). Any error is deemed harmless if "it did not seriously affect the verdict or render the trial fundamentally unfair." *Jacobson v. State*, 398 S.W.3d 195, 204 (Tex. Crim. App. 2013).

### C.     Analysis

The basis for Chambers's motion for a new trial was that, after trial, he discovered that Cal was under investigation and had pending criminal charges that the State failed to disclose before trial. In order to be entitled to a new trial based on newly available evidence, Chambers had to show, *inter alia*, that the allegedly new evidence was unknown or unavailable to him at the time of trial. *See Carsner*, 444 S.W.3d at 2–3. Chambers testified that it was only after trial that he was informed of the investigations and criminal charges against Cal for sexual assault of his half-sister. However, our review requires us to assume that the trial court disbelieved that testimony. *See Burch*, 541 S.W.3d at 821. Moreover, at the hearing on the motion for a new

---

[11]"Although unpublished opinions have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd)).

7

trial, the trial court expressed its disbelief that Chambers had not been informed of the charges against Cal by his family before trial. That disbelief is understandable considering Emma's trial testimony that she often played with Cal and Jack and Chambers's testimony that Cal lived with Chambers's parents next door to Chambers during 2017 and that Chambers had notified Cal's mother and sister when he found Cal watching Emma use the restroom one month before Emma's outcry against him.

As a result, we must imply that the trial court found that Chambers failed to show that the allegedly new evidence was unknown or unavailable to him at the time of trial. *See id.* Because Chambers failed to show that the allegedly new evidence was unknown or unavailable to him at the time of trial, he was not entitled to a new trial based on newly available evidence. *See Carsner*, 444 S.W.3d at 2–3.

This finding also impacts our analysis under Article 39.14(h). Even assuming, without deciding,[12] that the State was required to disclose the information regarding the investigations and charges against Cal, the trial court was not required to grant a new trial on that basis unless it affected Chambers's substantial rights. *See Herndon*, 215 S.W.3d at 908. Chambers's testimony at the new trial hearing showed that he was concerned with Cal's conduct toward Emma, at the latest, on June 25, 2017, over a month before Emma made her outcry. Yet, when he was interviewed by law enforcement on three occasions in August 2017, he did not disclose that

---

[12]The State argues that it was not required to disclose the complained-of information because it involved a different victim and different perpetrator unrelated to this case and was therefore not relevant evidence. We note that Cal was not a witness in the case, that there were no allegations against Cal that involved Emma made by any person either in the investigation of Emma's complaint or during the trial, and that the only allegations of inappropriate conduct by Cal with Emma were made after trial by Chambers. Nevertheless, because we find that the trial court impliedly found that any violation of Article 39.14(h) by the State did not affect Chambers's substantial rights, we need not decide this issue

8

information to them. For over two and one-half years[13] after he was indicted for this offense, he also apparently never disclosed his concerns about Cal to his attorney. He also did not disclose the information regarding the investigation and charges against Cal to his attorney before trial. As the trial court noted, with the information Chambers possessed, if he thought that Cal was the perpetrator, that could have been fleshed out in the investigation or at trial.

As a result, we must infer that the trial court found that any failure by the State to comply with Article 39.14(h) "did not seriously affect the verdict or render the trial fundamentally unfair." *Jacobson*, 398 S.W.3d at 204. Because the record supports that finding, we find that the trial court was within the zone of reasonable disagreement in denying the motion for a new trial based on the State's alleged failure to comply with Article 39.14.

Because we find that the trial court did not err in denying Chambers's motion for a new trial, we overrule Chambers's first and second issues.

## II.     Chambers Forfeited His Complaint About the Rule 614 Exemption

In his third issue, Chambers complains that the trial court abused its discretion when it exempted one of the State's experts, Cassy Rhodes, from Rule 614 of the Texas Rules of Evidence and when it failed to direct Rhodes to answer a question by counsel regarding a diagnosis of Emma. Regarding the Rule 614 exemption, Chambers argues that the State did not meet its burden to show that Rhodes's presence in the courtroom was essential to its case.

Rule 614 requires the trial court, at a party's request, to exclude witnesses so that they cannot hear other witnesses' testimony, with certain exemptions. TEX. R. EVID. 614. Rule 614

---

[13]The State filed the indictment against Chambers on June 27, 2019.

9

"prevents witnesses from tailoring their testimony to fit that of other witnesses and enhances the jury's ability to detect falsehood by exposing inconsistencies in testimony." *Allen v. State*, 436 S.W.3d 815, 822 (Tex. App.—Texarkana 2014, pet. ref'd) (citing TEX. R. EVID. 614; *Caron v. State*, 162 S.W.3d 614, 618 (Tex. App.—Houston [14th Dist.] 2005, no pet.)). One exemption to Rule 614 sequestration is "a person whose presence a party shows to be essential to presenting the party's claim or defense." TEX. R. EVID. 614(c). The party claiming a Rule 614 exemption has the burden to show that the exemption applies. *Allen*, 436 S.W.3d at 822 (citing *White v. State*, 958 S.W.2d 460, 463 (Tex. App.—Waco 1997, no pet.)).

Even if a trial court errs in exempting a witness from Rule 614, because it is a "violation of an evidentiary rule, the error is non-constitutional and will be disregarded unless it affected the appellant's substantial rights." *Russell v. State*, 155 S.W.3d 176, 181 (Tex. Crim. App. 2005) (citing TEX. R. APP. P. 44.2(b)). "The question in assessing the harm of allowing [a non-exempt witness] to remain in the courtroom is whether he was influenced in his testimony by the testimony he heard." *Id.*

"To avoid forfeiting a legal argument for inadequate briefing, an appellant's brief must contain 'a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.'" *Taylor v. State*, 558 S.W.3d 215, 218 (Tex. App.—Texarkana 2018, no pet.) (quoting TEX. R. APP. P. 38.1(i)); *see Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011). "[E]ncompassed within Rule 38.1 is the party's task of explaining or discussing why an argument has substance." *Id.* (citing *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017)). "[A]n appellate court has no 'obligation to construct and compose [an]

10

appellant's issues, facts, and arguments with appropriate citations to authorities and to the record.'" *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017) (quoting *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008)). In other words, "an appellate court is not required to make an appellant's arguments for [him]." *Id.* (citing *Lucio*, 351 S.W.3d at 898). "An issue is inadequately briefed when an 'appellant does not address the question of whether the alleged error . . . was harmless.'" *Fowler v. State*, No. 06-20-00030-CR, 2020 WL 6731733, at *4 (Tex. App.—Texarkana Nov. 17, 2020, no pet.) (mem. op., not designated for publication) (quoting *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000)); *see Wilson v. State*, 473 S.W.3d 889, 901 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *Sierra v. State*, 157 S.W.3d 52, 64 (Tex. App.—Fort Worth 2004), *aff'd*, 218 S.W.3d 85 (Tex. Crim. App. 2007)).

In addressing this issue, Chambers did not provide any argument that demonstrated how he was harmed by the trial court's alleged error and did not cite to any appropriate authorities and to the record.[14] For that reason, Chambers forfeited this complaint. We overrule this issue.

## III.   Any Error Related to the Trial Court's Failure to Instruct Rhodes Was Harmless

Chambers argues that the trial court abused its discretion by refusing his request to instruct Rhodes to answer his question regarding a diagnosis of Emma that appeared in her records. A trial court's evidentiary decision is reviewed for an abuse of discretion. *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Id.*

---

[14]In addressing his separate complaint regarding the failure of the trial court to order Rhodes to answer his question, Chambers provides two citations to the record, neither of which appear related to this complaint.

11

(quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)).

Rhodes, a licensed professional counselor employed at Counseling and Psychological Services of East Texas (CPSET), counseled Emma from September 2017 through March 2019. Most of Rhodes's direct testimony consisted of her counseling with Emma and what Emma told her regarding the allegations against Chambers. She also provided expert testimony regarding counseling victims of child sexual abuse. Approximately one year before Rhodes counseled with Emma, Toney Charles, a licensed psychologist employed at CPSET, performed a psychological evaluation on Emma by referral because she complained of social and anxiety issues.

Among Charles's diagnostic impressions contained in his evaluation report was that Emma exhibited "Axis II Histrionic and Dependent Personality Traits."[15] On cross-examination, Chambers questioned Rhodes about the meaning of histrionic and dependent personality traits:

> Q [By Chambers's attorney] Okay. On here it says histrionic and dependent personality traits. What does that mean?
>
> A I would hate to -- that's a huge thing to describe, so --
>
> Q Well, --
>
> A -- I would rather have a book with me to read to you what that is than try to explain that.
>
> Q And what does histrionic mean?

---

[15] On direct examination, Rhodes testified that Charles had seen Emma before she did, but that Rhodes did not know about it. Rhodes did not testify about Charles's evaluation report.

12

A        I'm not going to explain that to you.

Q        I need you to answer.

A        I can't -- I can't -- I can't.  I'm sorry.

Q        I need you to answer my questions.

A        I can go get my phone and look it up for you and explain it to you that way.  It's something very difficult to describe.

Q        I would like you to answer my question.

[BY THE STATE]:  I believe she's already asked and answered that she can't describe it.  She said she could look it up for him, but if she can't answer it, then asked and answered.

[BY CHAMBERS'S ATTORNEY]:  She hasn't given me an answer.  I mean --

THE COURT:  She said she couldn't . . . give you an answer.  She can't -- just doesn't know what it is without looking it up, so --

Q        (By [Chambers's attorney]) Well, can you describe in any way what that diagnosis is from your office in October of 2016?

A        I don't really feel comfortable doing that, no.

Q        I mean, do you know it and just not feel comfortable, or do you not know?

A        That's -- it's -- there's a lot to it, and I -- I'm --

Q        Okay.  So do you know it or not?

A        I don't know how to describe it.

Q        In any way you don't know how to describe it?

13

I mean, this is a diagnosis from the office you work in from a psychologist you work with. Through your training, do you know what that means, histrionic and dependent personality traits?

A      Yes.

Q      Can you explain to the jury what it means?

A      No.

Q      How can you know what it is and not be able to explain it?

I would ask that you not look at her for the answer.

[BY THE STATE]:  You know, I just -- she's asked and answered it, and I just don't know --

THE COURT:  That's a different question, so --

[BY THE STATE]:  Okay.

Q      (By [Chambers's attorney]) How can you know what it is and not be able to explain it?

A      It's not something I feel comfortable just doing.

Q      I mean, do you not feel comfortable because you have a fear of what that looks like for this jury, or do you not feel comfortable because you're afraid you're going to get it wrong?

A      It's something I think is very important, and I would rather not take a gander at that.

Q      I mean, it's important because it's a medical diagnosis of this girl that made an outcry that happened a year before; right?

A      Yes.

Q      It's a diagnosis a year before, and you can't explain it --

A      Can you --

14

Q       -- or won't explain it; correct?

A       I -- I don't feel comfortable describing that.

> [BY CHAMBERS'S ATTORNEY]: Your Honor, if at this point she can't answer a question, I'm going to ask that all of her testimony be stricken and that the jury be asked to disregard all of her testimony and her records be stricken.

> [BY THE STATE]: I don't even know what that objection is, Your Honor. I don't -- that's not in the rules of evidence, but --

> [BY CHAMBERS'S ATTORNEY]: If she's been qualified as an expert and she can't answer a question, I don't know what else to do but have the Court direct her to answer the question.

> THE COURT: And I've been -- I've directed her to answer, and she's indicated she can't answer the question, Mr. Thorson.

With certain exceptions not applicable in this case, when a witness knows the answer to a question, but refuses to answer it, the trial court should, on request, instruct the witness to answer. *See Flores v. State*, 491 S.W.2d 144, 147–48 (Tex. Crim. App. 1973). If the witness still refuses to answer, she should be held in contempt. *Id.* at 148. The trial court errs if, after a request, it refuses to instruct such a witness to answer. *Id.* Chambers asserts that the trial court erred since Rhodes would not answer his question and it did not instruct her to answer.

However, in the above exchange, it is not clear that Rhodes refused to answer Chambers's question. When he initially asked for the meaning of histrionic and dependent personality traits, Rhodes explained that it was difficult to describe, but that she could look it up and explain it to him. When the trial court explained that he understood her testimony to mean she could not answer his question without looking up the meaning, Chambers revised his

15

questions to focus on what the phrase meant in Charles's diagnosis stated in his psychological evaluation of Emma. Rhodes answered that she was not comfortable guessing what that diagnosis meant. Chambers then asked the trial court to direct her to answer the question. Although the trial court incorrectly stated that it had already done so, it also stated that it understood Rhodes to be testifying that she was not able to answer Chambers's question.

Although there may be other interpretations of this exchange, we cannot say that the trial court's interpretation was outside the zone of reasonable disagreement. At the beginning of his cross-examination, Chambers established that Rhodes was a licensed professional counselor with a master's degree in counseling. He also established that Charles was a psychologist, that, in Texas, one must have a doctorate to be a psychologist, and that a psychologist performs psychological evaluations. It was in that context that Rhodes testified that she was not able to state the meaning of histrionic and dependent personality without looking it up. Yet, Chambers then asked her to state her expert opinion regarding a diagnosis of Emma made by a licensed psychologist who held a doctorate in psychology. Under those circumstances, we cannot say that it was unreasonable for the trial court to believe that Rhodes was unable, and perhaps unqualified, to answer that question, and not that she refused to answer it. As a result, the trial court had no obligation to instruct Rhodes to answer. For this reason, we find that the trial court did not abuse its discretion by failing to instruct Rhodes to answer. Finding no error, we overrule this issue.[16]

---

[16]Even if we found an abuse of discretion, Chambers has not shown that the error affected his substantial rights. In his brief, he cites to two instances in the record to show harm. In the first, the State asked Rhodes if Emma's anxiety increased after the abuse by Chambers. Chambers objected because Rhodes was not willing to testify about Emma's previous diagnosis made by Charles, and the trial court sustained the objection. In the second instance,

## IV.    Chambers Did Not Show Cumulative Error

Chambers also asserts that the cumulative effect of errors in the trial court impermissibly influenced the jury. He points to several instances in the record that he contends were errors. The record shows that, in the first eight instances that he cites, Chambers objected to the questions asked by the State, to the non-responsive answers of the witness, and to comments by the State. As Chambers acknowledges, in each of those instances, the trial court sustained his objections. The trial court also instructed the jury to disregard the question, answer, or comment when requested by Chambers. Chambers also points to two instances in which he objected to the admission of the SANE examination records as hearsay within hearsay, which the trial court overruled. In his brief, Chambers does not provide any argument that explains how the trial court erred in any of those instances, and he does not cite to any appropriate authorities that would support any such argument. As explained above, we are not required to make Chambers's arguments for him. *See Wolfe*, 509 S.W.3d at 343. As a result, he presents nothing for our review related to those ten instances. *See Taylor*, 558 S.W.3d at 218.

Chambers also points to "the testimony of Cassy Rhodes referenced above." However, he does not specify whether that statement refers to the complaints contained in his third issue,

---

Rhodes testified without objection about her observations of the difference in Emma's behavior in the CAC interview and in the courtroom. She was then asked if she would expect the behavior she observed in the courtroom in that environment. Chambers objected to Rhodes "offering an opinion about [Emma's] . . . diagnosis," and the trial court overruled that objection. Regarding the first instance, we cannot think of any way that Chambers was harmed when the trial court prevented Rhodes, at Chambers's request, from testifying on a matter that was based on Charles's diagnosis. In the second instance, the context of the question shows that Rhodes was not being asked to give an opinion that was related to Emma's diagnosis. Finally, we also note that, in his case-in-chief, Chambers elicited testimony from his expert psychologist regarding the meaning of a diagnosis of histrionic and dependent personality traits and how that might impact the possibility of a child with that diagnosis making a false allegation of sexual abuse.

which we have previously addressed, or whether it refers to the brief outline of Rhodes's testimony contained in the statement of facts section of his brief.

In the statement of facts section, Chambers notes several instances in which Rhodes's records or certain testimony by Rhodes were admitted over his objection. To the extent that that is the testimony Chambers references in this issue, his complaint suffers the same deficiencies as his complaints addressed above: he neither provides argument that explains how the trial court erred in admitting this evidence nor does he provide citations to appropriate authority supporting such an argument. As a result, to the extent he references Rhodes's testimony outlined in the statement of facts section, Chambers presents us nothing to review. *See id.*

To the extent he refers to the complaints in his third issue, we have found that the Rule 614 complaint was forfeited and that the trial court did not err by failing to instruct Rhodes. "[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). Likewise, we are aware of no authority that holds that a claim of cumulative effect of errors can be supported by a single non-error. Because Chambers has not shown a cumulative effect of errors, we overrule this issue.

## V.     Conclusion

For the reasons stated, we affirm the trial court's judgment.


                                      Scott E. Stevens
                                      Justice

Date Submitted:      November 3, 2022
Date Decided:        November 30, 2022

Do Not Publish