

# NUMBER 13-16-00684-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

THE STATE OF TEXAS,                                                          Appellant,

v.

FRANCISCO ESCOBEDO,                                                         Appellee.

On appeal from the 148th District Court
of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Contreras and Benavides
Memorandum Opinion by Chief Justice Valdez**

The State of Texas appeals an order granting a motion for new trial rendered in

favor of appellee Francisco Escobedo. A jury convicted Escobedo of aggravated sexual

assault of G.U.,[1] a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.021 (West, Westlaw through 2017 1st C.S.). The trial court assessed punishment at forty years in prison.[2] By one issue, the State contends that the trial court abused its discretion in granting a motion for new trial based on ineffective assistance of counsel and an alleged *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). We vacate the trial court's order granting a new trial and reinstate Escobedo's conviction.

## I.    BACKGROUND

Following his conviction, Escobedo moved for a new trial. In his motion, Escobedo alleged, in pertinent part, as follows:

> Defendant alleges that the Nueces County District Attorney's office failed to comply with Texas Law as it applies to the production of discovery. Specifically, the Nueces County District Attorney's Office failed to comply with Morton and *Brady*.[3] The Nueces County's District Attorney's Office had knowledge and relevant evidence pertaining to the Children's Advocacy Center that should have been produced to the Defense. Said information was in the possession of the District Attorney's Office prior to the commencement of this trial. Furthermore, since the current District Attorney Mark Skurka was on the Board of the Children's Advocacy Center he had

---

[1] We use initials for the minor and her family members in order to protect her identity. *See* TEX. R. APP. P. 9.8 cmt. (West, Westlaw through 2017 1st C.S.) ("The rule does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases.").

[2] The minimum term of imprisonment in this case was increased to twenty-five because the victim of the offense was younger than six years of age at the time that the offense was committed. *See* TEX. PENAL CODE ANN. § 22.021(f)(1) (West, Westlaw through 2017 1st C.S.).

[3] The Michael Morton Act, which is codified in Texas Code of Criminal Procedure article 39.14, provides that the State must upon the defendant's request

> produce and permit the inspection and the electronic duplication, copying, and photographing, by and on behalf of the defendant, of any offense reports, any designated documents, papers, written or recorded statements of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the state in the case.

TEX. CODE CRIM. PROC. ANN. art. 39.14(a) (West, Westlaw through 2017 1st C.S.).

In *Brady,* the United States Supreme Court held, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

2

personal knowledge of the deficiencies in their interview processes and further that they failed to meet state guidelines and standards. At all times relevant counsel for the Defendant believed that the State would use the [v]ideo as well as produce Ricardo Jimenez as a witness at trial since he was on the witness list. It was not until after the trial that counsel for the Defense learned about the issues involving the Children's Advocacy Center. Counsel for the Defendant would have employed a completely different trial strategy if they would have been given the evidence as required by Morton. Counsel would have hired phycologists [sic] as well as called other witnesses. Counsel for the Defendant believes the evidence not produced by the District Attorney's Office was relevant and would have resulted in a different outcome should he have presented that information to the jury.

The State by failing to produce discovery in compliance with Texas Law rendered counsel for the defense ineffective. By not providing the Defense with all discovery as required by law the Defense left out crucial witnesses. At the time of trial[,] the Defense Counsel had no knowledge that the discovery existed.

After conducting a motion for new trial hearing, the trial court granted the new trial based on ineffective assistance of counsel and in the interest of justice. The State appealed the trial court's order.

## II.    IN THE INTEREST OF JUSTICE

The State contends that the "trial court had no authority to grant a motion for new trial based on ineffectiveness of counsel when this ground was never raised in the motion, nor was there any evidence to substantiate a finding of either ineffective assistance of counsel or a *Brady* violation." *See Brady*, 373 U.S. at 87. By its order, the trial court granted the motion for new trial based on ineffectiveness of counsel and in the interest of justice. Thus, we must determine whether the trial court's ruling can be upheld on either ground. We turn to the steps enunciated in *State v. Herndon* and reaffirmed in *State v. Zalman*. *See State v. Zalman*, 400 S.W.3d 590, 594 (Tex. Crim. App. 2013); *State v. Herndon*, 215 S.W.3d 901, 907 (Tex. Crim. App. 2007).

3

## A.   Standard of Review

Historically, a trial court has had the authority to grant a new trial "in the interest of justice," and that decision is reviewed only for an abuse of discretion. *Herndon*, 215 S.W.3d at 907. The test for abuse of discretion is not whether the facts present an appropriate case for the trial court's action, but rather, "whether the trial court acted without reference to any guiding rules or principles." *Howell v. State*, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005). The mere fact that a trial court may decide a matter differently from an appellate court does not demonstrate an abuse of discretion. *State v. Thomas*, 428 S.W.3d 99, 103–04. (Tex. Crim. App. 2014). We view the evidence "in the light most favorable to the trial court's ruling, defer to the trial court's credibility determinations, and presume that all reasonable fact findings in support of the ruling have been made." *Id*. at 104. We reverse a trial court's decision to grant a new trial only when it is "so clearly wrong as to lie outside the zone within which reasonable persons might disagree." *State v. Simpson*, 488 S.W.3d 318, 322 (Tex. Crim. App. 2016).

A trial court may grant a motion for new trial "in the interest of justice." *Herndon*, 215 S.W.3d at 907. However, the trial court's discretion to grant a motion for new trial "in the interest of justice" is not "unbounded or unfettered." *Id*. "A trial judge does not have authority to grant a new trial unless the first proceeding was not in accordance with the law." *Id*. Trial courts should not grant a new trial if the defendant's substantial rights were not affected; otherwise, the phrase "interest of justice" would have no substantive legal content. *Id.* at 908.

According to the court of criminal appeals, a trial court will not abuse its discretion in granting a motion for new trial in the interest of justice if the defendant:  (1) articulated

a valid legal claim in his motion for new trial; (2) produced evidence or pointed to evidence in the trial record that substantiated his legal claim; and (3) showed prejudice to his substantial rights. *Id.* at 909. Although a defendant need not show reversible error before the trial court may grant a motion for a new trial, "trial courts do not have the discretion to grant a new trial unless the defendant demonstrates that his first trial was seriously flawed and that the flaws adversely affected his substantial rights to a fair trial." *Id*.

**B.    *Brady v. Maryland***

The State must disclose evidence which is favorable to the accused that creates a probability sufficient to undermine the confidence in the outcome of the proceeding. *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992) (en banc). There can be no *Brady* violation without suppression of material favorable evidence. *Id*. Favorable evidence is evidence that may make a difference between conviction and acquittal and includes both exculpatory and impeachment evidence. *Id*. Exculpatory evidence may justify, excuse, or clear the defendant from fault, while impeachment evidence is that which disputes or contradicts other evidence. *Id*.

Evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ex parte Kimes*, 872 S.W.2d 700, 702 (Tex. Crim. App. 1993) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Id*. Materiality is determined by examining the alleged error in the context of the entire record and overall strength of the state's case. *Thomas*, 841 S.W.2d at 404–05.

**C.    Discussion**

5

### 1.   Valid Legal Claim

To determine whether the trial court abused its discretion in granting a new trial, we must first decide whether Escobedo stated a valid legal claim in his motion for new trial.  *Zalman*, 400 S.W.3d at 594.  Escobedo alleged that the verdict was contrary to the law and evidence and that the State violated *Brady's* disclosure requirements.  Due process requires prosecutorial disclosure of information, which is material and favorable to the accused that creates a probability sufficient to undermine the confidence in the outcome of the proceeding.  *Thomas*, 841 S.W.2d at 404.  Thus, Escobedo articulated a valid legal claim.  *Id*.

### 2.   Evidence in the Record Did Not Substantiate the Claim

Next, we look to the second *Herndon* step and determine whether Escobedo produced or pointed to evidence in the trial record that substantiated his claim.  *Zalman*, 400 S.W.3d at 594.  This requires a detailed discussion and analysis of the events that occurred at trial and at the motion for new trial.  *State v. Barragan*, 421 S.W.3d 16, 20 (Tex. App.—Waco 2013, pet ref'd).

### a.   Testimony at the Trial Court

At the guilt-innocence phase of trial, the State called:  (1) G.U., (2) her mother L.U., (3) her grandmother J.U., (4) her grandfather D.U., (5) reporting officer Steven Moran, (6) child crimes unit detective J.R. Rodriguez, (7) sexual assault nurse examiner Sandra Pardo, and (8) licensed counselor Danea Mickey.  G.U. testified that when she was four years old, at least ten times, Escobedo, her biological father, would take off all her clothes, and "would stick his private into [hers]."  She asked him to "please stop it, but he wouldn't."

6

J.U. testified that on September 9, 2014, at 8:00 p.m. while G.U. was taking a shower, from the other side of the shower curtain, G.U. said, "Grandma, can I tell you something . . . you promise you won't get mad, Grandma . . . [Escobedo]'s been putting his pee pee on my pee pee." According to J.U., G.U. stated that Escobedo would show her "videos of big people doing that, and then he would pull my panties down and make me do it, and it burned . . . it burns Grandma." J.U. recalled that L.U. thought G.U. "wasn't wiping well because she was sore down there." On another occasion, L.U. told J.U. that G.U. would crawl "under the bed and hold herself down there . . . Why would she be doing that, Mom? She's four years old." J.U. said she did not know why G.U. would do that.

L.U. testified that when she confronted Escobedo about G.U.'s outcry, he remained calm and level-headed, and she could see it in his eyes "that he wasn't telling [her] the truth." When she asked G.U. why G.U. hadn't told her about this before, G.U. told her that she did not want to upset L.U. L.U. testified that she found G.U. under the bed one day rubbing her private area, and she had never done that before.

D.U. testified that when G.U. told L.U. about what happened, they both started screaming and crying, so he hugged G.U. for some time. He asked L.U. what she wanted to do about this and told her that if she took G.U. around Escobedo, D.U. would report her. D.U. took G.U. to the hospital where G.U. was extremely emotional and prevented the staff from performing a genital exam. After the alleged sexual assault, G.U. has not been herself. According to D.U., it is harder for her to concentrate, difficult for her to focus and complete homework, G.U. cries easily, and is emotional about everything.

Child crimes unit detective J.R. Rodriguez from the Corpus Christi Police Department testified that based on his investigation, G.U.'s testimony was consistent

7

throughout. Forensic nurse examiner Sandra Pardo from Driscoll Children's Hospital testified that G.U. told her, "Daddy did something mean to me. My daddy touches me here . . . touches me there . . . with his part. I didn't like it. He does it when mommy goes to work. I told him to stop." Pardo explained that she was unable to perform a genital exam because G.U. "was crying. She was fearful. Her eyes were looking down at the floor . . . She was shaking. She was running behind the trash can during the genital portion of the exam." According to Pardo, she had never seen a patient run behind the trash can before, and she has performed over 1,100 exams.

Licensed professional counselor Danea Mickey testified that during a session, G.U. chose a male (father) and female (daughter) puppet. Mickey testified that G.U. became very aggressive in her play after a few days. She was beating up the father puppet and saying things like, "No, you can't do that. Don't hurt me. You're not going to hurt me anymore." After a few more days, G.U. role played the alleged sexual abuse with dolls and showed Mickey what Escobedo had been doing to her. She referred to him as "Frank" because "a dad would not do this, so he's not my dad. He's just Frank." Based on her sessions with G.U., it was Mickey's opinion that G.U. was sexually abused.

### b. Testimony at the Motion for New Trial

At the motion for new trial hearing, Escobedo called the former Nueces County District Attorney Mark Skurka. Skurka testified that he was a Child Advocacy Center (CAC) board member. He sits on the board because there is a memorandum of understanding (MOU) that provides a partnership between the district attorney's office and the CAC. He testified that he has never disclosed the existence of the MOU or the CAC's board minutes to defense counsel. In 2015, Skurka received a report of a site visit

8

from the Child Advocacy Center of Texas indicating, among other things, that the CAC facility in which recorded interviews were performed was not large enough, lacked private waiting rooms for family, and that the CAC's case load was too large for one forensic room. Moreover, the lack of additional rooms caused serious time constraints and impacted the quality of the interviews. Additionally, the interviewers lacked proper training. According to Skurka, he did not disclose the deficiency report to defense attorneys because he did not think it would be material to a defendant's defense.

Skurka testified that the CAC, Texas Department of Family Protective Services (CPS), law enforcement, a representative from Driscoll Children's Hospital, and child unit prosecutor regularly attend monthly mandatory case review meetings to discuss pending cases. He did not provide defense attorneys with agendas to the case review meetings.

On cross-examination by the State, Skurka testified that his office turned over the alleged victim's actual interview in Escobedo's case to Scott Lemanski, Escobedo's trial counsel. According to Skurka, "if there [was] an issue with an interview . . . the actual interview itself was the best evidence of whether that interview may or may not be proper."

Michelle Putman, who prosecuted Escobedo's case, testified that she was unaware that "staff interviewers have not completed the CAC Texas core curriculum despite having interviewed hundreds of children during the employment thus far." Nonetheless, she did not believe that she was legally required to turn over the 2015 deficiency report regardless of whether she previously knew about it. As a child unit prosecutor, she has never called the forensic interviewer of the alleged victim to testify at trial and neither has the defense attorney in any of the cases that she has handled. When the trial court asked her if she thought it would be important for defense attorneys to know

9

that "forensic interviews that were being performed were under serious time constraints due to the presence of only one forensic interview room," she testified that she did not believe she was legally required to disclose that because "[a]ny issues about how long or short the interview was can be gleaned from watching the interview itself."[4] Also, she testified that the forensic interview of the alleged victim was not offered as evidence or played for the jury.

Next, Lemanski testified that he was unaware that the district attorney's office, the CAC, CPS, law enforcement, and Driscoll Children's Hospital had entered into different MOUs, and if the State had disclosed that information to him, he would have certainly addressed the different "conflicts of interest" at the trial setting. He believes that this

---

[4] At the motion for new trial hearing, the following exchanged occurred:

| [Court]: | Well, not only would it—[the CAC deficiency report] also says that the practice of having serious time constraints at the center impacts not only the quality of the interview, but also the fidelity to research based forensic interview guidelines. When you see an interview for 16 minutes, doesn't that cause you for concern? |
|---|---|
| [State]: | Sometimes it does and sometimes it does not. It just depends on the interview itself. |
| | . . . |
| [Court]: | Well, would you agree that this information would be exculpatory/and or used for impeachment purposes? |
| [State]: | No, I do not agree. |
| [Court]: | So you don't think a defense lawyer could use this to impeach, say, a witness in this case. |
| [State]: | Based on my research into case law I do not believe that it is proper impeachment evidence. |
| [Court]: | Well, do you think this information may be material when it comes to whether or not the defense counsel should file some type of motion to limit testimony by the victim? |
| [State]: | No, I do not. |

10

information "affects many, many cases, probably all the cases—potentially all the cases that have involved the CAC center." Lemanski stated that he would have probably retained expert witnesses to talk about how a child's testimony might have been affected or compromised by the current environment at the CAC. As part of his trial strategy, he would "have spent a lot of time trying to attack the process by which this child was interviewed, whether the interview was compromised as indicated" by the site reports, and he would have tried to impeach those that were present at the case review meetings. Lemanski was also unaware of any CAC deficiencies or lack of training and certification regarding the forensic interviewers. According to Lemanski, he would have liked to address those issues by requesting subpoenas for those involved. Thus, it was his opinion that he rendered ineffective assistance and Escobedo did not receive the benefit of a fair trial.

CAC Director Clarissa Mora testified on behalf of the State, stating that there was only one employee at the CAC that did not receive the proper training at the time the alleged victim was interviewed, and her name was Penny Green. However, Green did not play any role in interviewing the alleged victim in Escobedo's case.

**c.** **Analysis**

Escobedo argued that the trial court should grant a new trial in the interest of justice because the State "intentionally withheld documents from the defense that were material to his ability to defend himself in this matter." Specifically, Escobedo argued that the "substantial rights affected are going to be his right to receive all the evidence under Morton. He has a right to meaningfully cross[-]examine witnesses, which means he would have to have all of the information that's relevant." On the other hand, the State argued

that Escobedo could not show how the documents that were withheld were material or relevant.

After reviewing the record, we agree with the State that the withheld documents regarding the CAC, had they been produced prior to trial, would not have changed the outcome of the guilt-innocence trial especially given that neither the State nor Escobedo offered G.U.'s forensic interview from the CAC into evidence or played it for the jury. At the new trial hearing, Escobedo must have demonstrated that his trial was seriously flawed and that the flaws adversely affected his substantial rights to a fair trial. *Herndon*, 215 S.W.3d at 909. At trial, the State relied on G.U.'s live testimony. The State corroborated G.U.'s version of events through her mother, her grandparents, the detective, the forensic nurse examiner, and the licensed counselor. Escobedo's defense counsel raised the issue of G.U.'s credibility. He also suggested that there was no physical or scientific evidence of sexual assault.

In his motion, Escobedo argued he was entitled to a new trial because the State failed to disclose exculpatory and impeachment evidence that was material to his defense. At the motion for new trial hearing, Escobedo presented witnesses alleging that the State failed to disclose the CAC deficiency reports, which he alleged were material to his ability to defend himself. However, Escobedo produced no evidence at the motion for new trial hearing which undermined the testimony at the guilt-innocence trial. *See Barragan*, 421 S.W.3d at 23. Instead, the undisclosed documents relate only to the CAC facility in general and do nothing to discredit any of the specific testimony elicited at guilt-innocence trial. In fact, the State did not present any trial testimony about the CAC facility, it did not call any CAC forensic examiners, and it did not rely on G.U.'s forensic interview.

12

Because the documents have no bearing on any of the guilt-innocence trial testimony, the CAC reports do not exculpate Escobedo. *See Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2006) (en banc) (holding that Child Protective Services records were neither favorable nor material to the defendant's case as the victim's testimony was corroborated by other witnesses). Lemanski testified that his "ability and right to meaningfully cross examine witnesses was violated," but Escobedo does not point us to any evidence that "dispute[s], disparage[s], den[ies], or contradict[s]" any of the witnesses' testimony. *Thomas*, 841 S.W.2d at 404. Because the undisclosed documents that Escobedo relies on do not "justify, excuse or clear [Escobedo] from alleged fault of guilt," we conclude that they are neither exculpatory nor useful for impeachment purposes. *Id.*; *see Harm*, 183 S.W.3d at 408.

Nonetheless, even if the undisclosed documents contained some impeachment value, Escobedo's claims still fail because he has not satisfied the materiality requirement. Here, the State's case rested in large part on the testimony of G.U., but J.U., L.U., D.U., Pardo, Detective Rodriguez, and Mickey gave testimony that supported G.U.'s version of events. Thus, there is not a reasonable probability that but for the failure to produce the undisclosed information—deficiencies within the CAC facility—the jury would not have convicted him. *See Pitman v. State*, 372 S.W.3d 261, 272 (Tex. App.—Fort Worth 2012, pet. ref'd) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."). Escobedo asserts *generally* that the undisclosed documents were "relevant and would have resulted in a different outcome should he have presented that information to the jury," that he "would have employed a

completely different trial strategy," and that he would have retained expert witnesses to talk about how G.U.'s testimony might have been affected or compromised by the current environment at the CAC. However, Escobedo does not specify *how* he would have used the CAC reports to challenge G.U.'s credibility. Ultimately, he does not demonstrate that the undisclosed documents were materially significant to the outcome of the trial when neither the State nor Escobedo called the forensic interviewer or offered G.U.'s forensic interview into evidence or played it for the jury. According to Escobedo, he would have liked to attack the process by which G.U. was interviewed if he had known that forensic interviewers were not certified, but G.U.'s forensic interviewer was properly certified. Therefore, this information has no value as impeachment evidence. *See Kimes*, 872 S.W.2d at 704 (holding that the State's failure to turn over "offense reports and accompanying witness affidavits is mitigated by the fact that these materials would not have been admissible to impeach" a witness at the defendant's trial and therefore not material). On the record before us, we conclude the evidence from the new trial hearing does not substantiate Escobedo's claim because the CAC deficiency reports were not material to his defense at trial, and thus, there is no evidence of a *Brady* violation. *See Thomas*, 841 S.W.2d at 404. Because the second step of *Herndon* was not satisfied, the trial court abused its discretion in granting Escobedo's motion for new trial in the interest of justice.

### 3.    No Harm or Prejudice

Even if Escobedo had satisfied *Herndon's* second step, he still did not show that his substantial rights were affected. Trial courts should not grant a new trial unless a defendant shows prejudice to his substantial rights under the harmless error standards of

14

the Texas Rules of Appellate Procedure. *Zalman*, 400 S.W.3d at 593–94; *Herndon*, 215 S.W.3d at 909. Any error, defect, irregularity, or variance that does not affect substantial rights, i.e., does not seriously affect the verdict or render the trial fundamentally unfair, must be disregarded. TEX. R. APP. P. 44.2(b); *Jacobson v. State*, 398 S.W.3d 195, 204 (Tex. Crim. App. 2013). The records here are unrelated to whether Escobedo sexually assaulted G.U., and do not make a difference between conviction and acquittal. *See* TEX. R. APP. P. 44.2(b). We cannot infer from those records that G.U., L.U., J.U., D.U., Pardo, Rodriguez, and Mickey are untruthful, that Escobedo did not engage in sexual behavior with G.U., and that this information is not only favorable to Escobedo but also sufficient to result in Escobedo's acquittal had it been presented at trial. *See Harm*, 183 S.W.3d at 408.

After our review of the evidence at guilt-innocence trial and at the motion for new trial hearing, we find that the trial court abused its discretion in determining Escobedo produced or pointed to evidence that substantiated his legal claim and that his substantial rights to a fair trial were adversely affected. Although Escobedo need not show reversible error as a matter of law, nothing in the record reflects the guilt-innocence trial was "seriously flawed." *Herndon*, 215 S.W.3d at 909. Thus, the trial court erred in granting Escobedo's motion for new trial in the interest of justice.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

We next consider whether the trial court acted within its discretion by granting Escobedo's motion based on ineffective assistance of counsel.

In reviewing the granting of a new trial, "we look to the grounds pleaded by the movant in the motion and determine whether any of these grounds provide a basis for

15

granting the new trial." *State v. Fury*, 186 S.W.3d 67, 73 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). A defendant must allege sufficient grounds to inform the trial court as to why he is entitled to a new trial. *State v. Provost*, 205 S.W.3d 561, 566 (Tex. App.—Houston [14th Dist.] 2006, no pet.). A motion for new trial "must contain enough detail to give the other party notice of what is being complained of so that it can properly prepare for the hearing." *Zalman*, 400 S.W.3d at 594.

Here, Escobedo made no specific allegations as to why he should receive a new trial based on ineffective assistance of counsel nor does he allege that Lemanski's performance was deficient.[5] *See id.* at 590 (explaining that the trial court abused its discretion by granting a motion for new trial on evidentiary issues when the defendant only pleaded that the verdict was against the law and evidence). And, the State cannot "render" a defense attorney ineffective as Escobedo suggests. Escobedo asserts that the *State* failed to comply with discovery laws and therefore the *State* rendered Lemanski's performance ineffective, but ineffectiveness of defense counsel cannot be established through the State's omission and is instead established by showing that Lemanski's performance fell below an objective standard of reasonableness and, but for his unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). Escobedo admits that "[a]t the time of trial, the Defense Counsel had no knowledge that the discovery existed." Because Lemanski "had no knowledge that the discovery existed," his performance would

---

[5] The only allegation of ineffective assistance of counsel in Escobedo's motion for new trial is as follows: "The State by failing to produce discovery in compliance with Texas Law rendered counsel for the defense ineffective."

16

not have fallen below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688. Thus, the trial court abused its discretion in granting a new trial on this ground. Accordingly, the State's issue is sustained.

## IV. IDENTIFICATION AT TRIAL

Although the trial court specifically stated that it granted Escobedo's motion for new trial in the interest of justice and based on ineffective assistance of counsel and not on any other grounds listed in his motion, we will nevertheless uphold the trial court's judgment if any appropriate ground exists to support it. *Provost*, 440 S.W.3d at 104. Thus, we must also address the other grounds raised in Escobedo's motion for new trial even though it is apparent the trial court did not grant a new trial on those grounds. *Id*.

In his motion for new trial, Escobedo alleged that G.U. was unable to identify Escobedo at the time of trial and was only able to do so after Escobedo was pointed out by counsel for the State. The court of criminal appeals has held that the State is not prohibited from pointing to a defendant in the courtroom and referring to his physical appearance in the presence of a witness. *Moore v. State,* 424 S.W.2d 443, 445 (Tex. Crim. App. 1968); *Guerrero v. State*, 838 S.W.2d 929, 932 (Tex. App.—El Paso 1992, no pet.). Escobedo cites to no authority to support his contention; therefore, it is wholly without merit. The trial court abused its discretion if it granted a new trial on those grounds.

## V. LEGAL SUFFICIENCY

Escobedo also alleged in his motion for new trial that the verdict in this case is contrary to the law and the evidence. He based this assertion on the State's alleged *Brady* violation, which we have already rejected. In the instant case, G.U., J.U., L.U.,

17

D.U., Pardo, Detective Rodriguez, and Mickey testified for the State and established each essential element of the offense charged. *See* TEX. PENAL CODE ANN. § 22.021; TEX. CODE CRIM. PROC. art. 38.07 (West, Westlaw through 2017 1st C.S.). Therefore, the evidence in this case is legally sufficient to support the jury's verdict.

## VI. SUMMARY

In this case, Escobedo articulated a valid legal claim in his motion for new trial, but he did not produce evidence or point to evidence existing in the record that substantiated this claim. *See Simpson*, 488 S.W.3d at 324. The evidence adduced at the hearing on the motion for new trial—reports showing deficiencies within the CAC—was not favorable to Escobedo, nor did it suggest that the result of the proceedings would have been different if the evidence had been disclosed to Escobedo prior to trial. The evidence Escobedo presented at the hearing on the motion for new trial did not substantiate a claim that the guilt-innocence trial was "seriously flawed" under the legal claims he advanced. *Herndon*, 215 S.W.3d at 909. We sustain the State's issue.

## VII. CONCLUSION

We vacate the trial court's order granting a new trial and reinstate the judgment in accordance with the jury verdict.

<u>**/s/ Rogelio Valdez**</u>
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
19th day of December, 2018.