# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00366-CR

---

**Andrew Alan Brown, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF HAYS COUNTY
### NO. CR-21-4415-C, THE HONORABLE TRACIE WRIGHT-RENEAU, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Andrew Alan Brown guilty of continuous sexual abuse of a young child and assessed his punishment at life imprisonment. *See* Tex. Penal Code § 21.02(b). The trial court sentenced Brown accordingly. On appeal, Brown contends that the trial court abused its discretion by limiting his cross-examination of the State's DNA expert and by overruling his objection to the State's closing argument. He also contends that the trial court erred by allowing the State to question Brown about his post-arrest silence. We affirm the trial court's judgment of conviction.

## BACKGROUND

The indictment alleged that from August 2020 through August 2021, Brown abused Jessica Caldwell,[1] his children's playmate, at least twice by touching her vagina and penetrating

---

[1] Because Jessica was a minor at the time of the offense, we refer to her by a pseudonym in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

her anus with a vibrator. The State's witnesses included Jessica, who was ten at the time of trial in 2024; her mother (Mother); investigating officers; sexual assault nurse examiner (SANE) Julie Foran; Department of Public Safety (DPS) forensic scientists Danielle Neal and Gabriella Cansino-Jones; Sara Brown; and former forensic interviewer Maggie Ortuño. The defense presented testimony from Brown and Dr. William Carter, an expert on sexual abuse outcries. Among the evidence admitted at trial were Jessica's drawing of the vibrator used in the offense; the sexual assault forensic examination (SAFE) report; photographs of Brown's house and vehicle; still frames from a video of Jessica's forensic interview; text messages between Brown and Mother; and items seized from Brown's house, including clothing, lubricant, and a vibrator.

Mother testified about her family's relationship with the Browns and about Jessica's outcry on August 21, 2021. Mother had become friends with Brown and Sara in 2019 through Facebook. Over the next few years, Jessica would play with the Browns' two children—who in 2019 were around five and three—at least once a month. When Mother and Sara had girls' nights out, Jessica would stay with Brown at his house. And about once a month, the Browns would watch Jessica when Mother had to work on the weekend; Sara was not always present.

Mother and Sara had a falling out in August 2020. In the summer of 2021, however, Mother ran into Brown at a Vacation Bible School attended by Jessica, and he suggested they arrange a playdate. On August 21st, Jessica went to a sleepover at Brown's house. He dropped Jessica off at Mother's work the following afternoon.

That evening, while they were showering, Jessica told Mother that she had been up until 11:15 p.m. the night before; Mother asked why, and Jessica replied, "[W]ell, the boys went to bed, but I was laying in the bed with Andrew." Asked what she and Brown had been doing, Jessica answered, "[T]hat's when he massages my yoni," which was her and Mother's word for

2

"female private part." Jessica, who "didn't understand that there was something wrong with that," confirmed that Brown had massaged her previously. After speaking with law enforcement, Mother took Jessica for a forensic interview and SAFE.

Noting that "it could have happened more," Jessica testified about the two incidents of abuse that she could recall at trial, which occurred, respectively, at two houses in which Brown had lived in Dripping Springs, Texas. On the first occasion, Jessica, Brown, and his two children were lying on a bed watching a show, when Brown put his hand inside her shorts and rubbed her "yoni" with his hand. His children were at the foot of the bed, and she was underneath blankets by the bed's head, next to Brown.

The second occasion was the sleepover on August 21, 2021, when Sara was "out of town with friends." Jessica, Brown, and his children watched Paw Patrol at the EVO theater. The children played in sprinklers when they returned to the house, and afterward Brown took them to pick up groceries curbside from HEB. Brown bought cookies for only Jessica and himself. That night, after one of Brown's children fell asleep in the playroom, he put his other child to bed and told Jessica that she could watch a movie in Brown's room, which contained a king-size bed, bedside table, and desk; the bed had light blue sheets and an "orange-ish brown" comforter.

Brown, wearing only "shorts" with a flamingo-and-palm-tree pattern, told Jessica to take off her clothes and put on a yellow t-shirt, which fell to her knees and had a "little side pocket." With his hands, he rubbed lotion on her stomach, legs, and yoni, which she uses to "go pee." He then put "a little buzzing machine" in her "bottom," which she identified as the "private part[] . . . in the back."

Jessica described the vibrator as approximately an-inch-and-a-half long, white, and cordless with an on-off button on top and three speed-setting buttons. The trial court admitted into

3

evidence a drawing of the vibrator which Jessica had made during her forensic interview. Shown a photograph of the vibrator that was seized from Brown's bedside table,[2] she denied that it was "the vibrating buzzy thing that Andrew used on [her] the night of the sleepover." The vibration caused Jessica to need to defecate, but the abuse continued after she had done so in Brown's bathroom. She repeatedly told him that she wanted to go to bed, but he replied, "[A] few more minutes." She slept in Brown's bed that night and left her backpack at his house when he drove her to Mother's work the next day.

Defense counsel questioned Jessica about inconsistencies between her testimony and earlier statements. Jessica could not remember why she had not told anyone that the drawing of the vibrator was not to scale. She sometimes felt that others would be mad at her if she changed her story, which made her scared and worried. Asked why she had said previously that the vibrator was used "so many times," she testified, "It might have happened, but even from when I was seven I don't remember." She clarified that she had not thought much about the abuse in the intervening two-and-a-half years and that she had been told by the State that her only job was to tell the truth.

Foran, the SANE, testified about her examination of Jessica on August 22nd. Jessica's account was "very specific" and "detailed" and tracked her testimony at trial as to the abuse during the sleepover, including her description of the vibrator. As to prior incidents of abuse, Jessica told Foran that Brown had used the "vibrating machine" on one other occasion but that "every other time she had been around Andrew there had been some kind of rubbing." Jessica stated, "It has been happening since I've known them, since I was seven." Although she had no injuries, Foran testified that in "[m]ost cases of young child sexual assault, there are no injuries."

---

[2] The photo was later admitted into evidence.

She swabbed Jessica's vagina and anus but noted that the likelihood of physical evidence was lessened by her having showered, urinated, defecated, wiped, changed clothes, and been on a slip-and-slide since the assault.

Ortuño testified concerning Jessica's forensic interview, which like the SAFE occurred on August 22nd. Jessica told Ortuño that the night before, Brown had repeatedly inserted a "vibrating thing" or "vibrating sphere" into her "bottom," which Ortuño determined was Jessica's anus, and had rubbed her yoni with lotion or oil. The details of the sleepover incident were again largely consistent, and Jessica, who drew a picture of the vibrator, described it as white and having three speed settings. Unprompted, she demonstrated the positions that Brown had placed her in during the assault and added that he had repeatedly asked her whether it hurt or felt good.

Regarding prior incidents of abuse, Jessica said that Brown had rubbed her yoni around five or six times when she was at his house for playdates with his children. She indicated that it had happened "every time she went over there, other than one time, that she remembered." Ortuño testified that "script memory" sometimes occurs in cases of chronic abuse and refers to when, "rather than disclosing a concrete event of abuse, [a child-victim] talk[s] about it in generalities, such as sometimes this would happen, other—you know, one time it was here, but sometimes and usually and things of that nature." Ortuño agreed that during the forensic interview, Jessica had used language indicating that "this was more than just the two specific times she described."

As at trial, Jessica also disclosed in detail in the interview the incident at Brown's previous house in Dripping Springs. She stated that she, Brown, and his children had been watching a movie in bed and that Brown had rubbed her yoni with his hands and the "vibrating thing." His children did not see what Brown did because he did it "secretly." Ortuño confirmed

5

that in their forensic interviews, Brown's children said that they had neither been abused by Brown nor seen him abuse Jessica. Both children, however, stated that Jessica and Brown had slept in the same bedroom.

Current and former investigators with the Hays County Sheriff's Office testified regarding their response to the 911 call and a search of Brown's house pursuant to a warrant. Corporal Tommy McGreevy responded to Mother's house around 2:45 a.m. on August 22nd. Mother reported that a "sex crime" had occurred the night before; she appeared calm, but McGreevy could tell that she "was beating herself up." Mother indicated that before May 2021, she had not seen the Browns for over a year. McGreevy collected the clothing Jessica had worn to the sleepover and advised Mother to schedule a forensic interview.

Detective Benjamin Gieselman went to Brown's house that night to take photographs for the search warrant application. While parked behind the house, he observed Brown apparently cleaning his vehicle in the garage and putting a white trash bag into a trash can on the house's side. Once additional officers arrived after the issuance of the search warrant, Gieselman executed an arrest warrant for Brown.

Detective Brian Wahlert described Brown's demeanor as "very calm" on learning that he had been arrested for continuous sexual abuse of a child. Because Sara was in Houston, Brown arranged for his mother to pick up his children. The trash can beside the house contained a single white trash bag, inside of which officers found a bottle of "Platinum personal lubrication," which was almost full and unexpired. From a recycling container, they recovered an HEB curbside receipt showing that two packages of cookies had been purchased on August 21st. In a covered compartment in the trunk of Brown's vehicle, officers discovered a bag containing lip gloss; makeup brushes; and pink "women's underwear, or [a] child's underwear."

6

Inside the house, officers documented or seized items corroborating Jessica's account, including her backpack; various lubricants, oils, and lotions; a comforter that Wahlert described as "maroon"[3]; boxers with a flamingo pattern on the floor of the main bedroom near the laundry hamper; a swimsuit with the same pattern; and a yellow shirt with a front pocket—which Wahlert agreed was "like a kid's shirt"—inside a second hamper in the laundry room. The main bed had been stripped of bedding, sheets, and pillowcases, and the comforter had been washed; no other beds had been stripped. Cleaning supplies were laid out, and it appeared to be "Sunday cleaning."

Investigators also looked for a vibrator that matched Jessica's description. In a bedside table in the main bedroom, they found an "adult massager and wrist straps." Found with the vibrator were six attachments, which Wahlert testified were white and approximately two inches long. Wahlert testified that the vibrator was not the one described by Jessica and did not match the given description. However, he also testified that of the items found, it best matched the description; that it was the only vibrator found; that they did not get all they "thought was relevant"; and that he may have said that he felt they got "exactly what [he] thought [he] needed to get in the search." The vibrator, pink underwear, and t-shirt were sent for DNA testing. Wahlert requested that Jessica's clothing be tested as well.

Neal and Cansino-Jones testified about the results of the DNA testing in the case. Neal testified that no male DNA was detected on Jessica's cervical or anal swabs; testing of the external vaginal swabs was inconclusive. Neal explained that a small amount of DNA was detected, but she could not confidently say that it was male.

---

[3] The comforter appears to be orange in photographs admitted into evidence.

A voir dire hearing was held outside the jury's presence, at which the parties and trial court discussed the scope of Cansino-Jones's testimony with respect to DNA testing of the six vibrator attachments seized from the bedside table. At the hearing, she testified that Jessica and Brown were excluded as contributors from any DNA found on the items. While Sara was not excluded as a contributor, Cansino-Jones explained that she could not testify about the likelihood of Sara's being a contributor without discussing other profiles that had been obtained from the attachments. Her report, which was admitted for purposes of the hearing, concluded that the DNA profiles obtained from all but one of the attachments were mixtures; the exception was a profile originating from a single male. Each mixture was of at least two individuals, and for each, at least one of the contributors was male. The report stated that Sara was excluded as a contributor for two of the five mixture profiles.

The defense argued at the hearing that testimony that Sara's DNA was found on the attachments was exculpatory and that its admission was required under the Sixth Amendment. Defense counsel asserted that the State had created the inference Brown destroyed evidence and that "the fact that Sara's DNA is on it when she's been out of town takes out any possibility that he has cleaned, tampered with evidence, manipulated evidence."

The State and trial court suggested that the parties could stipulate that Brown did not wash the vibrator and that Sara's DNA was found on it. The defense rejected the stipulations and newly argued that it was imperative to show that Sara "and two other men are on it."[4] The presence of male DNA, defense counsel argued, was necessary to "get the full picture" or because

---

[4] It is unclear from the report that the male profiles belonged to two men.

"maybe there w[ere] some other men with Sara Brown in the Brown house."[5]  The defense once more argued that exclusion of the testimony "widely undercuts our theory of the case, our defense, and . . . would deprive our client of his Sixth Amendment right."  Ultimately, the trial court ruled that "the exclusionary principles only related to the test will be admitted because those are reliable and valid."

Cansino-Jones testified before the jury that no blood or semen was located on the pink underwear.  She also testified that Brown and Jessica were excluded as contributors from any DNA found on the vibrator attachments.

Sara testified that she and Brown had been married since 2011, had lived together in two houses in Dripping Springs, moved into their second home in 2020 or 2021, and were in divorce proceedings.  She testified that on the weekend of August 21st, she was in Houston for a concert and had not known of the sleepover.  She also testified that when she arrived in Houston, she repeatedly called and texted Brown, but he did not answer; one of her children told her that Jessica was at the house.

Sara further testified that four months after the sleepover and after learning of Jessica's description of the vibrator that Brown had used, Sara told a detective that she had seen the vibrator before and that Brown had used it on her.  The vibrator was small, white, cordless, had three speed settings, and was "what's considered a bullet vibrator."  Although she had not mentioned this vibrator to investigators at first, she was confused and had thought they were concerned only with the seized vibrator.  When she realized which vibrator officers were referring to, she looked in the box where she and Brown kept their adult toys but could not find it.

---

[5]  The defense clarified that it was not arguing that Jessica had been abused with the vibrator by someone other than Brown.

9

Brown testified that his and Mother's families socialized around fifteen to twenty times from 2019 until the sleepover, that he was present for most of the children's playdates, that Sara was present "some of the time[s]," and that he and Sara had lived in three houses since having their children. He testified that he never played alone with Jessica. He also testified that the August 2021 playdate was Mother's idea and that he had not wanted Jessica to spend the night.

Text messages between Brown and Mother showed that the sleepover had been planned by at least August 20th. On the morning of August 22nd, Mother told Brown that she would pick up Jessica after recreational shooting with her boyfriend. Brown responded that he was going to take the children to a house showing for his job as a realtor, and Mother asked him to drop Jessica at her work. Brown testified that Sara had known about the sleepover but agreed he did not tell Mother that Sara would be out of town.

Brown also testified about what occurred during the sleepover on August 21st. He took the children to see Paw Patrol at EVO Cinemas and afterward to get groceries curbside at HEB. He cooked dinner while they played and then got his younger child ready for bed. Jessica had not brought pajamas, so Brown let her borrow his child's yellow shirt, which came down to her knees. Jessica and Brown's older child slept on a bed in the game room, and Brown went to bed around 10:45 p.m. after seeing that they had fallen asleep. He woke up the next morning when his younger child came into the room; Brown saw that Jessica was lying in his bed "where Sara would usually sleep." He testified that Jessica was "needy" and had called him "Daddy" a few times before he "shut that down."

Brown first testified that he was "not aware of" any vibrator at his house matching the one described by Jessica. Elsewhere, however, he testified that "[n]o such vibrator existed" and that the vibrator seized by investigators had been the only one in the house. He explained that

the Platinum lubricant was in the trash because it was sticky and had a silicone base, which "stains everything" and "can degrade plastic." He acknowledged that he owned other silicone-based lubricants but added, "I knew it was a silicone lubricant when I bought it, but that's not the full picture or the sole reason."

Brown likewise discounted other facts of interest to investigators. Jessica had seen him in his flamingo-pattern swimsuit. Sundays were laundry day. And the makeup, lip gloss, and panties had been for Sara, who "tended to wear her underwear on the smaller side." He had eaten both packages of cookies and did not buy one especially for Jessica.

Following a bench conference, Brown testified that detectives had asked to speak to him "multiple times," including twice while he was in jail, and that each time, he had responded that he would speak with them in his attorney's presence. After he said that, "they were no longer interested in meeting with [him]." Brown accused Sara, Mother, and Jessica of lying and asserted that "given the fact that there are so many inconsistencies with the story," Jessica was "not able to keep the story straight."

Dr. Carter, the outcry expert, testified that between two and twelve percent of sexual abuse outcries are false and that not every child sexual abuse outcry is true; "[t]here'[ve] been some really well-documented cases of false allegations of child abuse where kids gave seemingly impeccable stories that turned out to be false." He noted that Jessica's outcry was unusual for being immediate and for alleging the use of a vibrator. While he testified that more often, the concerning part of the outcry process was "the investigative questioning process, not following proper protocol," he agreed that it was "ideal" that the outcry was immediate, the police were immediately called, and the forensic interview was quickly performed. He also testified that it was "the desired process" for the SAFE to be conducted sooner and that he had "no issues" with

11

Ortuño's forensic interview. He further testified that when asked whether there is a common quality or characteristic of child sex offenders, his usual reaction is to note that "narcissism is very high in these individuals." Having watched Brown testify, Dr. Carter agreed that he saw something "that would suggest [Brown] possessed these narcissistic traits."

The jury found Brown guilty of continuous sexual abuse of a child and, following a hearing on punishment, assessed his punishment at life imprisonment. This appeal followed.

## DISCUSSION

### I.      Exclusion of DNA Testimony

In his first issue, Brown contends that the trial court violated his Sixth Amendment right to present evidence by excluding testimony that DNA belonging to Sara and two men was found on the vibrator seized from the bedside table.[6] He argues that the testimony was vital to the defense because it rebutted the inference that the absence of Jessica's or his DNA on the vibrator resulted from his having removed evidence and because the testimony "would have allowed defense counsel to argue that another male, not [Brown], may have abused [Jessica]." The State responds that the excluded testimony was not exculpatory and that an alternative-perpetrator theory would have been groundless.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *see also Dabney*

---

[6] Although Brown asserts that the ruling also violated his right to counsel, that claim is unbriefed and appears to be coextensive with his other Sixth Amendment issue. *See Easley v. State*, 424 S.W.3d 535, 540 (Tex. Crim. App. 2014) (noting that when such an error "rises to the level of constitutional magnitude, the constitutional provision offended is . . . the ability to present a defense, not necessarily the right to counsel"). To the extent that Brown in fact raises two distinct issues, we therefore address them together.

*v. State*, 492 S.W.3d 309, 316 (Tex. Crim. App. 2016). "This includes complaints that the exclusion of evidence infringed the defendant's constitutional right to a meaningful opportunity to present a defense." *Dewalt v. State*, 307 S.W.3d 437, 451 (Tex. App.—Austin 2010, pet. ref'd). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). In other words, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see also Henley*, 493 S.W.3d at 82. An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

The Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). "With respect to the erroneous admission or exclusion of evidence, constitutional error is presented only if the correct ruling was constitutionally required"; misapplication of the rules of evidence is not constitutional error, and the erroneous exclusion of defensive evidence "is not constitutional error if the trial court's ruling merely offends the rules of evidence." *Tate v. State*, 988 S.W.2d 887, 890 (Tex. App.—Austin 1999, pet. ref'd). Under the facts of this case, the trial court's ruling only rose to the level of a constitutional violation if it erroneously excluded relevant evidence that was a vital portion of the case, and the exclusion effectively precluded Brown from presenting a defense. *See Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005). Such erroneous rulings are rare. *See Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002).

13

There was no constitutional error in this case because Brown was able to present his defense, and the trial court's ruling was not erroneous. The Court of Criminal Appeals has explained that when a defendant is permitted to testify about his defensive theory, the exclusion of evidence does not effectively prevent him from presenting his defense. *See Ray*, 178 S.W.3d at 836. Brown's defensive theory was that the vibrator recovered from the bedside table was the one that Jessica had outcried was used on her and that the absence of her and Brown's DNA showed that her outcry was fabricated.

Brown testified that the seized vibrator was the only one in the house, that it belonged to Sara, and that Jessica was lying. He agreed that Jessica was "manipulative" and "conniving" enough to attempt falsely to accuse him but testified that the falsity of her story was evidenced by its inconsistencies. Supporting the defense's theory, Cansino-Jones testified that Brown and Jessica were excluded as contributors to the DNA profiles obtained from the vibrator attachments. In rebuttal to any inference that Brown had been removing or destroying evidence when police arrived at his house, he testified that he always did laundry on Sunday, that he had had no idea the police were going to arrest him, and that he had thrown out the bottle of Platinum lubricant because he disliked it. The defense similarly elicited testimony from Detective Wahlert that cleaning supplies had been set out and that it appeared to be "Sunday cleaning" because Brown was "in the process of cleaning" the entire house. The defense was able to articulate its theory in its closing argument: "And some of you may think, look, for me my doubt is the DNA on the vibrator that's not Andrew's or [Jessica]'s. That's my doubt."

In addition to Brown's ability to present his chosen defensive theory, the trial court's exclusion of the evidence would not have been an abuse of discretion under Texas Rule of Evidence 403. "Generally, the right to present evidence and to cross-examine witnesses under the

14

Sixth Amendment does not conflict with the corresponding rights under state evidentiary rules. Thus, most questions concerning cross-examination may be resolved by looking to the Texas Rules of Evidence." *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009). In most cases, "compliance with the reasonable construction and application of a rule of evidence will . . . avoid a constitutional question." *Id.*

"The Constitution leaves to the [trial] judges . . . 'wide latitude' to exclude evidence" that, among other things, "poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689–90 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). To that end, Rule of Evidence 403 provides that a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Probative value" means more than relevance; rather, it "refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). "Unfair prejudice" refers to a "tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*; *see Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021). Under the rule, there should be "reluctance on the part of an appellate court to reverse trial court decisions which admit or exclude evidence." *Montgomery*, 810 S.W.2d at 378. Although "it is most helpful to reviewing courts," "a trial judge is not required to articulate his Rule 403 analysis on the record." *State v. Mechler*, 153 S.W.3d 435, 444 n.8 (Tex. Crim. App. 2005).

In conducting a Rule 403 analysis, the trial court must balance the claimed probative force of the proffered evidence along with the proponent's need for the evidence against:

> (1) any tendency of the evidence to suggest that the case would be decided on an improper basis; (2) any tendency of the evidence to confuse or distract the jury from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Henley*, 493 S.W.3d at 93 (citing *Gigliobianco*, 210 S.W.3d at 641–42). These factors may blend together in practice. *Gigliobianco*, 210 S.W.3d at 642.

### i. Inherent Probative Value

The probative value of the excluded testimony would have been limited. First, the question of whose DNA was on the seized vibrator was not a disputed fact at trial. *Cf. Castaneda v. State*, 694 S.W.3d 13, 24 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd) (determining that evidence was highly probative in part because it was offered to support disputed fact). The testimony would have been relevant to the defense's theory that the seized vibrator was the one alleged to have been used by Jessica and that the absence of her DNA, coupled with the presence of Sara's, was evidence that the allegation was fabricated. However, the State's theory—supported by Jessica's testimony and consistent description as well as Sara's and Wahlert's testimony—was that the seized vibrator was not the one used to assault Jessica. Thus, the excluded testimony was exculpatory only if the jury found Brown's defensive theory more credible than Jessica's, Sara's, and Wahlert's testimony.

There was, moreover, no evidence supporting the theory of an alternate perpetrator, and the presence of male DNA on the vibrator attachments would have done nothing to advance

16

such a theory. Jessica was never alone in the Browns' house without Sara or Brown being present and never made an outcry against anyone but him. Most significantly, Jessica's DNA was not present on the vibrator attachments, undermining any theory that the vibrator had been used by another offender to assault her. Even if the presence of unknown male DNA could have created an inference that an offense had occurred—which is doubtful—the inference would not mean that the offenses alleged by Jessica did not also occur. This is all the more so given the dissimilarity between the recovered vibrator and the one described by Jessica.

Additionally, the DNA evidence was somewhat equivocal in supporting Brown's desired conclusion. During the voir dire hearing, Cansino-Jones explained that the data for one of the profiles for which Sara was not excluded as a contributor was "really low" and that the probability of the profile originating from Sara and two unknown individuals was "equally likely" to the probability of its coming from "three unrelated, unknown individuals." More strikingly, Cansino-Jones's report concluded that Sara was excluded as a contributor to the profiles obtained from swabs taken from three additional attachments. Defense counsel argued during the hearing that admission of evidence of the presence of Sara's DNA specifically was necessary because she was absent from the house that weekend and her DNA could not have been placed on the attachments between the assault and the vibrator's seizure. Yet for four of the six attachments, Sara's DNA was either not present or was present in an amount that made its probative value minimal.

For these reasons, this factor therefore weighs at most slightly in favor of the testimony's admission.

### ii.     Proponent's Need for Evidence

17

This factor "encompasses the issues of whether the proponent has other evidence establishing this fact and whether this fact is related to a disputed issue." *Mechler*, 153 S.W.3d at 441. As noted above, the theory of an alternate perpetrator was not raised in earnest at trial, and the State did not dispute whether Sara's DNA was recovered from the seized vibrator but repeatedly agreed, at the trial court's suggestion, "to write out a stipulation that says [Sara's] DNA is on it so we don't have to ask questions that [Cansino-Jones] cannot answer." Thus, the principal fact established by the excluded testimony could have been established by other evidence, but the defense did not agree to the stipulation. *See Bryant v. State*, 187 S.W.3d 397, 400 (Tex. Crim. App. 2005) (stating that stipulation is "a kind of judicial admission" that has effect of "withdrawing a fact from issue and dispensing wholly with the need for proof of the fact"). This factor weighs in favor of the testimony's exclusion.

### iii.    Tendency to Suggest a Verdict on an Improper Basis

The testimony would have been likely to create a risk of a decision on an improper basis. Sexually related bad acts are inherently inflammatory, *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013), and a jury may render a verdict on an improper basis when evidence "arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence," *Gigliobianco*, 210 S.W.3d at 641. Both Sara and Brown testified that the seized vibrator was hers; there was no evidence connecting it to him. Sara's sexual history was not directly relevant to any element of the offense or to a contested issue at trial. And there was no evidence that Brown knew about, much less approved of, her engaging in extramarital sexual acts. Accordingly, the excluded evidence would have invited potential inferences that Sara had been unfaithful to Brown and had been intimate with multiple additional partners, possibly including

18

women.[7]  These inferences in turn had the potential to arouse the hostility of jurors who view such behavior unfavorably against Sara, particularly in light of the evidence that she was in divorce proceedings against Brown.  It is plausible that jurors moved by the excluded evidence on an emotional basis would have discounted the weight or credibility of Sara's testimony, which was the principal corroborating evidence for the existence of the vibrator described by Jessica.  This factor therefore weighs strongly in favor of the testimony's exclusion.

### iv.  Tendency to Confuse and Distract and Tendency to Be Given Undue Weight

Confusion of the issues "refers to a tendency to confuse or distract the jury from the main issues in the case."  *Id.* (citing S. Goode, *et al.*, *Texas Practice: Guide to the Texas Rules of Evidence* § 403.2 at 165 (3d ed. 2002)).  For example, "[e]vidence that consumes an inordinate amount of time to present or answer . . . might tend to confuse or distract the jury from the main issues."  *Id.*  This factor must be analyzed "in view of the availability of other means of proof."  *Hepner v. State*, 966 S.W.2d 153, 160 (Tex. App.—Austin 1998, no pet.).

"'Misleading the jury' means a risk that the evidence would be given undue weight for reasons other than emotional ones; an example is scientific evidence that a jury is not equipped to judge."  *Valadez v. State*, 663 S.W.3d 133, 142 (Tex. Crim. App. 2022).  Scientific or technical evidence may not be easily comprehensible to laypeople, and appellate courts must be deferential to a trial court's decision to admit or exclude scientific evidence.  *See Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd); *Hepner*, 966 S.W.2d at 160.

---

[7]  The report interpreted one mixed profile as "a mixture of three individuals, at least one of which is male."  Although the results were equivocal, Sara could not be excluded as a contributor to the profile.

During the voir dire hearing, the trial judge warned that "we're getting lost in the weeds" and explained:

> I'm concerned about having a jury understand how—I mean, it took me, who actually knows a tiny bit, teeny tiny bit, about DNA 30 minutes talking one-on-one with this expert to figure it out, and now we're going to throw it at a jury? . . . I'm concerned that it's going to confuse the issue, is my concern . . . . I'm really concerned this is going to confuse the heck out of them.

The parties and court had apparent difficulty at times understanding the contingent and conditional nature of Cansino-Jones's testimony. The trial court asked a number of clarificatory questions, and Cansino-Jones testified regarding her likely need—were she to testify about the probability of Sara's DNA being present—to testify also about the range of likelihood ratios and the distinction between exclusionary and inclusionary determinations. She added, "To explain an inclusionary statement, I have to describe the entire profile and how many contributors it may contain. If it is a mixture, I would have to indicate that and how many contributors that profile has."

The testing in this case involved comparisons of samples from two named individuals not otherwise mentioned at trial as well as unknown males for whom partial profiles were obtained. Cansino-Jones testified that any conclusion regarding the presence of Sara's DNA on the attachments would have required addressing the particular likelihood ratios for each compared known profile together with the number of possible contributors. The highly technical nature of the evidence and the existence of so many otherwise irrelevant people would have fostered a significant risk that the jury would be confused or distracted or that it could lend undue weight to the testimony. These factors weigh heavily against the testimony's admission.

v. **Time to Develop**

20

This factor likewise concerns "whether the jury would be distracted from consideration of the charged offense." *Mechler*, 153 S.W.3d at 441. The time needed to develop the evidence "necessarily includes any testimony introduced regarding the evidence, including cross-examination, redirect examination, and any rebuttal offered by the defense in response to the evidence." *Hart v. State*, 688 S.W.3d 883, 893 (Tex. Crim. App. 2024).

The voir dire hearing occupied around forty-five pages—or approximately seven percent—of the approximately 675-page trial record. *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (factor weighed in favor of admission where testimony amounted to "less than one-fifth" of trial testimony); *Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd) (finding that factor weighed in favor of admission where relevant testimony "was only eight pages long"). However, much of the testimony bore little if any relevance to the charged offense. *See Mechler*, 153 S.W.3d at 441. This factor is therefore neutral or weighs but slightly in favor of the testimony's admission.

### vi.    Summary

Three of the five *Gigliobianco* factors support the trial court's ruling, two strongly; conversely, at most, two factors slightly support the testimony's admission. The testimony had little probative value, was not needed by the defense, would likely have confused or distracted the jury, and could have created a risk that the jury unduly emphasized the testimony's emotional impact or highly technical nature. For these reasons, we conclude that the trial court would not have abused its discretion by excluding the testimony under Rule 403. *See Henley*, 493 S.W.3d at 82–83. We overrule Brown's first issue.

## II.    Improper Argument

21

In his second issue, Brown contends that the trial court abused its discretion by overruling defense counsel's objection to the following statements made during the State's rebuttal:

(1) "The oath that I take is to seek justice in all things. The oath that they take is to zealously represent their client."

(2) "Like I said, [the d]efense threw mud and tried to distract you."

(3) "We have very different jobs. The cleaner the case, the more mud you have to throw at it, and that is exactly what [defense counsel] just got up here and did for 30 minutes."

(4) "I think it's really disingenuous for [the d]efense to get up here and say that we didn't bring you anything."

Brown argues that the first statement "was clearly meant to instruct the jury that only the State's attorneys were trying to seek truth and justice, while the defense attorneys were trying to mislead the jury, thus, striking at Appellant over the shoulders of his defense counsel." The State responds that the issue was not preserved for appeal as to statements two through four. Regarding the first statement, the State argues that the trial court did not abuse its discretion by overruling counsel's objection and that, alternatively, any error was harmless.

"To preserve error regarding an improper argument, a party must object each time an allegedly improper argument is made." *Bell v. State*, 566 S.W.3d 398, 404–05 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996)). Defense counsel objected to only the first statement: "Object[ion], improper. I think at this point we're get[ting] into disparity between the State and Defense. I don't know that this is proper." Because counsel did not object to the remaining statements, Brown's issue on appeal was not preserved as to them. *See* Tex. R. App. P. 33.1(a); *Bell*, 566 S.W.3d at 404–05.

22

We review a trial court's ruling on an improper argument objection for an abuse of discretion. *See Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004). Proper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement. *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019).

"It is axiomatic that the State may not strike at a defendant over the shoulders of his counsel or accuse defense counsel of bad faith and insincerity." *Fuentes v. State*, 664 S.W.2d 333, 335 (Tex. Crim. App. 1984). The Court of Criminal Appeals has emphasized its particular concern with "arguments that result in uninvited and unsubstantiated accusation of improper conduct directed at a defendant's attorney." *Orona v. State,* 791 S.W.2d 125, 128 (Tex. Crim. App. 1990). "In its most egregious form, this kind of argument may involve . . . an attempt to contrast the ethical obligations of prosecutors and defense attorneys." *Mosley v. State*, 983 S.W.2d 249, 258–59 (Tex. Crim. App. 1998) (citing *Wilson v. State,* 938 S.W.2d 57, 58–60 (Tex. Crim. App. 1996), *abrogated on other grounds by Motilla v. State*, 79 S.W.3d 352 (Tex. Crim. App. 2002)). A prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel "when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character." *Id.* at 259. We view an alleged argument error "in light of the facts adduced at trial and in the context of the entire argument." *McGee v. State*, 774 S.W.2d 229, 239 (Tex. Crim. App. 1989).

Although the Court of Criminal Appeals has repeatedly found that arguments contrasting the ethical obligations of prosecutors and defense attorneys are improper, those cases are distinguishable from the present case in the severity of the arguments determined to be improper. *See, e.g.*, *Wilson*, 938 S.W.2d at 58 ("*I have taken a very sacred oath, in my opinion, to*

23

*see that justice is done in every case I prosecute . . . . [Defense Counsel] has no such oath, and what he wishes is that you turn a guilty man free.*"); *Bell v. State*, 614 S.W.2d 122, 123 (Tex. Crim. App. 1981) ("(Defendant's counsel) is a criminal defense lawyer. He doesn't have the same duty I do. He represents the criminal. His duty is to see that his client gets off even if it means putting on witnesses who are lying." (bolded in original)); *Lewis v. State*, 529 S.W.2d 533, 534 (Tex. Crim. App. 1975) ("[The prosecutors] have taken a solemn oath to God to seek justice . . . . No such oath bears on either one of these attorneys (defense counsel).").

The statement in this case was more similar to the one in *Raborn v. State*. *See* No. 05-10-00685-CR, 2011 WL 653776, at *2 (Tex. App.—Dallas Feb. 24, 2011, no pet.) (not designated for publication). The prosecutor in *Raborn* argued that he took an oath "to see justice is done." *Id*. When defense counsel objected that he had taken an oath as well, the prosecutor replied, "Not to see that justice is done, Counsel." *Id.* Although our sister court noted that the argument was "not as flagrant as the conduct in other cases," it concluded that the argument was nevertheless improper because it "contrasted the ethical obligations of the two attorneys." *Id.* at *3; *see Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995).

We find *Raborn* persuasive and conclude that the State's argument in this case was improper. The trial court therefore abused its discretion by overruling defense counsel's objection. *See Garcia*, 126 S.W.3d at 924.

Having determined that the trial court erred, we must next address whether the error was harmful. Arguments that strike over the shoulders of counsel are analyzed for nonconstitutional harm under Rule of Appellate Procedure 44.2(b). *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000); *see* Tex. R. App. P. 44.2(b). The trial court's ruling is harmless if it

"did not 'affect substantial rights,' i.e., it did not seriously affect the verdict or render the trial fundamentally unfair." *Jacobson v. State*, 398 S.W.3d 195, 204 (Tex. Crim. App. 2013).

The Court of Criminal Appeals has held that determining harm under that standard in improper argument cases requires balancing three factors: (1) severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley*, 983 S.W.2d at 259. However, in a recent decision, the Court reaffirmed that "the *Mosley* factors are merely an application of Rule 44.2(b)—a derivative created because of the facts in *Mosley*—not a competing alternative." *Hallman v. State*, --- S.W.3d ---, ---, No. PD-0332-22, 2025 WL 1812902, at *5 (Tex. Crim. App. July 2, 2025). "There is no conflict between the *Mosley* factors and Rule 44.2(b)." *Id.*

The prejudicial effect of the State's argument was minimal. The statement neither directly accused defense counsel of dishonesty nor suggested that evidence had been manufactured. *See Mosley*, 983 S.W.2d at 260. The prosecution did not expressly contrast the parties' ethical obligations again. *Cf. id.* (noting that State "reemphasized the statements after the trial court overruled appellant's objection"). Rather than the more egregious arguments at issue in *Lewis*, *Bell*, and *Wilson*, the argument in this case at most indicated "that the defense may be attempting to distort the jury's view of the evidence through clever argument." *See id.* (calling argument "mildly inappropriate"); *Raborn*, 2011 WL 653776, at *3 (concluding that "the effect of the misconduct was relatively mild"). Even viewed in the light of the other statements that Brown finds objectionable, the tone of the argument merely indicated that defense counsel "would attempt to use argument to divert the jury's attention or obscure the issues." *See Mosley*, 983 S.W.2d at 258.

25

The trial court took no curative action to ameliorate the improper argument. However, there was considerable evidence of Brown's guilt. Jessica's account of the two specific incidents of abuse that she identified in her testimony was highly detailed and remained largely consistent between her outcry and trial. The defense's questioning on cross-examination concerned principally her failure to explain at eight years old that her drawing of the vibrator had not been to scale and her inability to remember the particulars of other assaults.

Moreover, much of Jessica's account of the assault during the sleepover was corroborated by evidence recovered from Brown's house and by Brown's and Sara's testimony. Brown and Sara testified that Sara had been out of town the weekend of the sleepover. Jessica and Brown each testified that on August 21st, the children had played in sprinklers or a slip and slide, seen Paw Patrol at EVO Cinemas, and picked up groceries curbside from HEB. A receipt for the groceries, which reflected the two cookie packages referenced by Jessica, was found in Brown's recycling. In the trash can next to the recycling bin, officers discovered a nearly full, unexpired bottle of lubricant; although Brown testified that he had thrown it out because it was silicone-based and sticky, other silicone-based lubricants were observed in the house. Jessica correctly identified the size of Brown's bed and the color of its sheets and comforter. The yellow t-shirt she testified she had worn during the assault was found in a laundry hamper; on the floor of the main bedroom were boxers matching Jessica's description of what Brown had been wearing during the assault. Her backpack, which she testified she had left at Brown's house, was also found by investigators. Brown admitted that Jessica had been in his bed, and his children told Ortuño in their forensic interviews that Brown and Jessica had slept in the bedroom together.

Additional evidence was similarly inculpatory. Prior to the sleepover, Mother and Sara had not spoken to one another for around a year. Mother testified that Brown came up with

26

the plan for the playdate on August 21st, and Sara testified that she had not been told about it. Brown agreed that he had not told Mother that Sara was out of town. Dr. Carter testified that his primary preoccupation in researching false outcries was whether proper protocol had been followed. He testified that the outcry process in this case was particularly desirable and that he did not see cause for concern in the forensic interview. He also testified that Brown exhibited narcissistic traits, which are the primary characteristic of child sex offenders.

Perhaps most incriminating was the alleged nature of the abuse. The defense offered no plausible justification for a young child to allege that she had been anally penetrated by a vibrator and no motivation for Jessica to make such an outcry falsely, apart from her being "needy." Indeed, the latter characterization could have worked against Brown, as he could not explain why he had not disclosed to anyone Jessica's supposedly concerning behavior, including calling him Daddy and sleeping in his bed. Although the defense's principal theory was that the seized vibrator was the one described by Jessica—and that the absence of her and Brown's DNA showed that her outcry was false—no attempt was made to explain how Jessica would have known of the existence, appearance, and purpose of the vibrator in the bedside table.

What is more, the seized vibrator—which Jessica testified was not the one used during the August 2021 assault—bore little resemblance to her description. Jessica consistently described the vibrator as around two inches long, white, cordless, and having an on-off button and three speed settings. The seized vibrator was significantly larger, blue-gray, and had a long black cord with no visible speed settings. The defense's suggestion that Jessica had perhaps confused the white or flesh-colored attachments with the vibrator itself did little to mitigate the differences. Jurors could have found more plausible Wahlert's testimony that the seized vibrator was not the one described by Jessica but that it had been tested for DNA because it was the only vibrator

27

located. In addition, Sara testified that Brown had once possessed a vibrator exactly matching Jessica's description and that it had gone missing after the assault.

Given the brevity and mildness of the objected-to argument; the fact that the State moved on following the objection and did not reemphasize the statement; and the record in this case, including the weight of the evidence against Brown, we conclude that the argument did not seriously affect the verdict or render the trial fundamentally unfair. *See Jacobson*, 398 S.W.3d at 204. We overrule Brown's second issue.

## III. Post-Arrest Silence

In his third issue, Brown contends that the trial court erred by allowing the State to cross-examine him about his post-arrest, post-*Miranda* silence in violation of the Fifth Amendment. The State argues that the issue was not preserved and is without merit, or, alternatively, that any error was harmless.

Prior to Brown's testimony, the trial court held a bench conference at which the State announced its intention to question him as to why he had not provided a statement to law enforcement before trial. Defense counsel did not object to the anticipated questioning at the hearing but told the State's attorney, "You definitely can't do that." The challenged cross-examination occurred during the following exchange before the jury:

> Q You have been under this allegation since the time of your arrest on August 22nd of 2021, right?
>
> A Yes.
>
> Q And this is the first time that the State is hearing anything about text messages, about [Mother] and Sara lying, about your allegations that [Jessica] is lying, right?
>
> DEFENSE COUNSEL: Objection. He wouldn't know what the State—what we had negotiated before this. I think it calls for improper, I guess, what we've been

28

doing, which I guess she asked about—

Q No. You provided none of what you just testified to. You have not talked to law enforcement. You have not called the district attorney's office—

DEFENSE COUNSEL: Objection. Your Honor, this is the statement on the—may we approach? This is a statement on the Fifth Amendment.

THE STATE: It's not, once he's taken the stand.

DEFENSE COUNSEL: She's making a comment on his invocation to his right to an attorney when they arrested him out at the gate and then put him—

THE COURT: I think you're making a comment on it. I think she's just—I think she's just verifying that this is the first time he's ever said anything.

DEFENSE COUNSEL: Oh, okay.

A I was asked to speak—or I had detectives ask to speak to me multiple times, and in every single instance, as soon as I mentioned that I would be happy to speak with them in the presence of an attorney, they were no longer interested in meeting with me. I think that answers your question.

Q You said multiple times. When did you do that? What dates?

A Oh, the first two times were August 22 and 23rd, the nights that I was in jail. They pulled me out of the cell at least two, if not three, times. And I told her that that very night, "I would be happy to speak with you in the presence of an attorney." They immediately sent me back to the holding cell.

Q Okay. And then did you call the police department and say, "I'm ready to talk with my attorney"?

DEFENSE COUNSEL: Objection. This is improper, Your Honor. He had an attorney. He had invoked his right.

THE COURT: Everyone, let's move on.

In light of the bench conference and the State's questions, defense counsel's Fifth Amendment objection was sufficiently specific to alert the State and trial court to the grounds for the complaint. *See Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). Although the

29

court reporter was unable to hear portions of the bench conference, the court's understanding of

the State's anticipated questioning was evident:

> THE COURT: Oh, you can generally get into the fact that he hasn't (inaudible), but you can't get into specifics (inaudible) and ask why he never said this before—
>
> . . . .
>
> THE STATE: He's never made the statement.
>
> THE COURT: He doesn't have to, though.
>
> THE STATE: I know, but they can—that's proper cross-examination.
>
> THE COURT: Okay, but—okay, well, then they're going to redirect on this fact that he (inaudible)—

By permitting the State to continue its questioning despite defense counsel's

objection, the trial court implicitly overruled the objection. *See* Tex. R. App. P. 33.1(a); *see also*

*Rey v. State*, 897 S.W.2d 333, 336 (Tex. Crim. App. 1995) (observing that ruling "need not be

expressly stated" if the trial court's "actions or other statements otherwise unquestionably indicate

a ruling"); *State v. Kelley*, 20 S.W.3d 147, 154 n.3 (Tex. App.—Texarkana 2000, no pet.) (noting

that reviewing courts will generally find that trial court made implicit ruling when "the objection

was brought to the trial court's attention and the trial court's subsequent action clearly addressed

the complaint"). Accordingly, Brown's third issue was preserved for appellate review.

The Fifth Amendment to the United States Constitution provides that "[n]o person

. . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend.

V. This guarantee was made applicable to the states by the Due Process Clause of the Fourteenth

Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 8 (1964). "Consistent with this Fifth Amendment

guarantee, law enforcement officials, before questioning a person in custody, must inform him that

30

he has the right to remain silent and that any statement he makes may be used against him in court." *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (citing *Dickerson v. United States*, 530 U.S. 428, 438–439 (2000); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). While it is true that the *Miranda* warnings "contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Griffith v. State*, 55 S.W.3d 598, 605 (Tex. Crim. App. 2001).

Thus, the United States Supreme Court has held that it is a violation of a defendant's due process rights for the State to use his post-arrest silence after he has been Mirandized to impeach his testimony at trial.[8] *Doyle v. Ohio*, 426 U.S. 610, 619 (1976); *see Griffith*, 55 S.W.3d at 604 ("The guaranty of fundamental fairness in the Due Process Clause forbids the government from making the *Miranda* promises and breaking them by using a suspect's exercise of a right as evidence against him."); *Hampton v. State*, 121 S.W.3d 778, 782 (Tex. App.—Austin 2003, pet. ref'd) ("One of the limitations on the prosecution's cross-examination of an accused may be the constitutional privilege against self-incrimination."). "A comment on a defendant's post-arrest silence is akin to a comment on his failure to testify at trial because it attempts to raise an inference of guilt arising from the invocation of a constitutional right." *Dinkins*, 894 S.W.2d at 356.

By asking why Brown had not previously spoken to law enforcement or prosecutors and why he was first providing his account at trial, the State was clearly and impermissibly attempting to impeach him with his post-arrest silence, in violation of Brown's constitutional rights. *See Doyle*, 426 U.S. at 619; *see also Hampton*, 121 S.W.3d at 784 (concluding analogous

---

[8] As the Court of Criminal Appeals has explained, "When the State seeks to impugn the explanation of the defendant offered at trial by showing that the defendant failed to advance his position at the time of the arrest, the State is essentially impeaching the defendant through the use of prior inconsistent conduct." *Sanchez v. State*, 707 S.W.2d 575, 580 (Tex. Crim. App. 1986).

31

provision of Texas Constitution was violated where "the State used [defendant's] post-arrest silence against him to discredit and impeach him on cross-examination by demonstrating to the jury that he had never told the investigating officer or any sheriff's deputy the exculpatory theory he related from the witness stand"); *Womack v. State*, 834 S.W.2d 545, 546 (Tex. App.—Houston [14th Dist.] 1992, no pet.) ("When the State called attention to the fact that appellant had not come forward to speak with the prosecuting attorney and admit his guilt, the State clearly made a comment on appellant's post-arrest silence.").

In reviewing whether a constitutional error harmed a defendant, we ask whether there is a reasonable possibility that the error might have contributed to the conviction or punishment. *Wells v. State*, 611 S.W.3d 396, 410 (Tex. Crim. App. 2020); *see* Tex. R. App. P. 44.2(a). We do not focus on the correctness of the trial's outcome but instead on the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict. *Wells*, 611 S.W.3d at 410. In other words, the reviewing court asks whether, in light of the existence of other evidence, the error adversely affected the integrity of the process leading to the conviction. *Id.* "A ruling that an error is harmless is, in essence, an assertion that the error could not have affected the jury." *Id.*

Non-exhaustive factors to consider include the nature of the error, whether it was emphasized by the State, its probable implications, the weight the jury would likely have assigned to the error in the course of its deliberations, and the presence of overwhelming evidence supporting the jury's verdict. *Id.* We must "take into account any and every circumstance apparent in the record that logically informs the harmless error determination, and the entire record is to be evaluated in a neutral manner and not in the light most favorable to the prosecution." *Id.* at 410–

32

11. "The State, as the beneficiary of the error, has the burden of proving that the constitutional error was harmless beyond a reasonable doubt." *Id.* at 411.

As discussed above, there was ample evidence of Brown's guilt at trial. The prejudicial concern with cross-examination about a defendant's post-arrest silence is that "an unfavorable inference might be drawn as to the truth of his trial testimony." *Doyle*, 426 U.S. at 619 (quoting *United States v. Hale*, 422 U.S. 171, 182 (1975) (White, J., concurring)). Yet in spite of the State's question, Brown's testimony did much to dull any negative inference, as he testified that he had repeatedly offered to speak to investigators in the presence of his attorney but that they were interested only in questioning him alone. The Court of Criminal Appeals has acknowledged the possibility that "jurors could readily choose to give an accused's post[-]Miranda silence no detrimental significance whatsoever, as evincing nothing more than an innocent reliance on the right itself." *Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988). Moreover, it is significant that the State "made no attempt to capitalize" on the objected-to testimony by "inviting inferences harmful to [his] credibility or defensive posture during final argument." *Id.* at 755. And although credibility was a central issue in the case, the jury did not request any portion of the transcript or submit questions to the trial court during its deliberations. *Cf. Hampton*, 121 S.W.3d at 784 (in concluding that error was harmful, noting that jury deadlocked and that trial court gave so-called "dynamite charge").

From our review of the record, we conclude beyond a reasonable doubt that the error did not contribute to Brown's conviction. *See* Tex. R. App. P. 44.2(a); *Wells*, 611 S.W.3d at 410. We overrule his third issue.

## CONCLUSION

Having overruled Brown's issues, we affirm the trial court's judgment of conviction.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:   November 26, 2025

Do Not Publish